

## *Foster v. Michigan*

United States Court of Appeals for the Sixth Circuit

July 16, 2014, Filed

Case No. 13-2209

### Reporter

573 Fed. Appx. 377 *; 2014 U.S. App. LEXIS 13785 **; 2014 WL 3511734

BELLANDRA FOSTER; BBF ENGINEERING SERVICES, PC, Plaintiffs-Appellants, v. STATE OF MICHIGAN; MICHIGAN DEPARTMENT OF TRANSPORTATION, Defendants, and VICTOR JUDNIC; MARK STEUCHER; RICK SNYDER, Governor of the State of Michigan; KIRK T. STEUDLE, Director of the Michigan Department of Transportation, Defendants-Appellees.

**Notice:** NOT RECOMMENDED FOR FULL-TEXT PUBLICATION. *SIXTH CIRCUIT RULE 28* LIMITS CITATION TO SPECIFIC SITUATIONS. PLEASE SEE *RULE 28* BEFORE CITING IN A PROCEEDING IN A COURT IN THE SIXTH CIRCUIT. IF CITED, A COPY MUST BE SERVED ON OTHER PARTIES AND THE COURT. THIS NOTICE IS TO BE PROMINENTLY DISPLAYED IF THIS DECISION IS REPRODUCED.

**Prior History: [**1]** ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN.

*Foster v. Judnic, 963 F. Supp. 2d 735, 2013 U.S. Dist. LEXIS 113121 ( E.D. Mich., 2013)*

*BBF Eng'g Servs., P.C. v. Michigan, 2012 U.S. Dist. LEXIS 13867 ( E.D. Mich., Feb. 6, 2012)*

### Core Terms

district court, scores, adverse action, contracts, consultant, firms, similarly situated, allegations, official capacity, direct evidence, proposals, gender, official-

capacity, complaints, team, evaluations, employees, grant summary judgment, project manager, rights, audit, woman, circumstantial evidence, gender discrimination, injunctive relief, discriminatory, subconsultant, retaliation, immunity, entity

## Case Summary

### Overview

HOLDINGS: [1]-A district court properly dismissed a contractor's claim asserting gender discrimination against the State of Michigan and various agencies and officials because Title VI, *42 U.S.C.S. § 2000d et seq.*, only applies to discrimination on the basis of race, color, or national origin and did not include gender based claims; [2]-The court found that the district court properly dismissed a contractor's claims under Michigan's Whistleblower Protection Act (WPA), *Mich. Comp. Laws § 15.362*, because they were not employees of defendants and they failed to identify an adverse action taken within the WPA's 90-day of limitations.

### Outcome

Judgment affirmed.

### LexisNexis® Headnotes

Civil Procedure > Appeals > Standards of Review > De Novo Review

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

Civil Procedure > ... > Summary Judgment > Appellate Review > Standards of Review

*HN1*[⬇] **Standards of Review, De Novo Review**

An appellate court reviews a district court's grant of summary judgment de novo. An appellate court reviews a district court's dismissal de novo.

Civil Procedure > Appeals > Standards of Review > Abuse of Discretion

Civil Procedure > Appeals > Standards

of Review > De Novo Review

Civil Procedure > ... > Pleadings > Amendment of Pleadings > Leave of Court

## *HN2*[⬇] **Standards of Review, Abuse of Discretion**

An appellate court typically reviews the denial of a motion to amend for abuse of discretion but reviews de novo a denial on the basis of futility.

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

Civil Procedure > ... > Pleadings > Complaints > Requirements for Complaint

Civil Procedure > Pleading & Practice > Pleadings > Rule Application & Interpretation

## *HN3*[⬇] **Motions to Dismiss, Failure to State Claim**

To survive a *Fed. R. Civ. P. 12(b)(6)*

motion to dismiss, a claim's factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the allegations in the complaint are true. That assumption that all the complaint's allegations are true does not, however, apply to legal conclusions or to legal conclusions cloaked as fact. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. Further still, where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged, but it has not shown, that the pleader is entitled to relief. *Fed. R. Civ. P. 8(a)(2)*.

Civil Rights Law > Protection of Rights > General Overview

## *HN4*[⬇] **Civil Rights Law, Protection of Rights**

Title VI of the Civil Rights Act of 1964, *42 U.S.C.S. § 2000d*, states: No person in the United States shall, on the ground of race, color, or national origin, be excluded from

participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. As a matter of plain language, Title VI does address discrimination on the basis of sex or gender.

Governments > Legislation > Interpretation

*HN5*[↧] **Legislation, Interpretation**

When the statutory language is plain, a court must enforce it according to its terms.

Civil Rights Law > Protection of Rights > General Overview

*HN6*[↧] **Civil Rights Law, Protection of Rights**

Because it does not say anything about sex or gender, the text of *42 U.S.C.S. § 2000d* itself compels the United States Court of Appeals for the Sixth Circuit to conclude that Title VI does not provide a cause of action for gender discrimination. Two sister circuits have reached the same

conclusion. Moreover, dicta from the United States Supreme Court cases contrasting Title VI with Title IX of the Educational Amendments of 1972, *20 U.S.C.S. § 1681*, suggests that Title VI is not applicable to gender discrimination.

Civil Rights Law > Protection of Rights > General Overview

*HN7*[↧] **Civil Rights Law, Protection of Rights**

*42 U.S.C.S. § 2000d-7* provides a cause of action for a gender-based Title VI claim and that statute indicates that the United States Congress intended to abrogate states' sovereign immunity and to provide remedies under Title VI, among other civil-rights statutes. *Section 2000d-7*, however, does not affect the substance of Title VI.

Civil Rights Law > Protection of Rights > General Overview

Labor & Employment Law > Discrimination > Actionable Discrimination

**HN8**[⬇️] **Civil Rights Law, Protection of Rights**

Title VI targets intentional discrimination only.

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

Civil Procedure > ... > Pleadings > Complaints > Requirements for Complaint

Civil Procedure > Pleading & Practice > Pleadings > Rule Application & Interpretation

**HN9**[⬇️] **Motions to Dismiss, Failure to State Claim**

A complaint that includes conclusory allegations of discriminatory intent without additional supporting details does not sufficiently show that the pleader is entitled to relief.

Civil Rights Law > Protection of Rights > General Overview

Civil Rights Law > Protection of Rights > Federally Assisted Programs > Scope

**HN10**[⬇️] **Civil Rights Law, Protection of Rights**

In Gebser v. Lago Vista Indep. Sch. Dist., the United States Supreme Court has held that vicarious liability was not available under Title IX and that a supervisory entity must have had knowledge of and been deliberately indifferent to an employee's discriminatory actions. The Gebser court reasoned that Title IX was a conditional statute rather than a prohibitory statute, so primary enforcement rested within the jurisdiction of the funding agency. Title VI contains a similar administrative enforcement provision. *20 U.S.C.S. § 1682* and *42 U.S.C.S. § 2000d-1*. Beyond that similar language, the Gebser court recognizes that Title VI and Title IX operate in the same manner. Accordingly, Gebser's interpretation that there is no vicariously liability under Title IX supports the notion that there is no vicarious liability under Title VI.

Civil

Procedure > Appeals > Reviewability of Lower Court Decisions > Preservation for Review

## HN11[↓] Reviewability of Lower Court Decisions, Preservation for Review

Issues adverted to in a perfunctory manner, without some effort to develop an argument, are deemed forfeited. Ordinarily, an appellate court will not address issues raised for the first time on appeal.

Civil Rights Law > Protection of Rights > Federally Assisted Programs > Discrimination

Civil Rights Law > Protection of Rights > Federally Assisted Programs > Federal Assistance

Civil Rights Law > Protection of Rights > Federally Assisted Programs > Scope

## HN12[↓] Federally Assisted Programs, Discrimination

A plaintiff may only assert Title VI claims against the entity receiving the financial assistance. Official-capacity claims are in all respects other than name, to be treated as a suit against the entity. Where the entity is named as a defendant, an official-capacity claim is redundant. Having sued the entity for which the plaintiff was an agent, the suit against the plaintiff in his official capacity was superfluous.

Civil Rights Law > ... > Section 1983 Actions > Elements > General Overview

Civil Rights Law > Protection of Rights > Section 1983 Actions > Scope

## HN13[↓] Section 1983 Actions, Elements

*42 U.S.C.S. § 1983* provides a civil cause of action for plaintiffs who have been deprived of rights: Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person

within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. Injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

Civil Rights Law > Protection of Rights > Section 1983 Actions > General Overview

Civil Rights Law > ... > Contractual Relations & Housing > Equal Rights Under the Law (sec. 1981) > General Overview

**HN14[⬇]** **Protection of Rights, Section 1983 Actions**

*42 U.S.C.S. § 1981* does not contain a private remedy. Rather, it is essentially part and parcel of a *42 U.S.C.S. § 1983* claim. A *42 U.S.C.S. § 1981* claim is analyzed using the same framework as a *42 U.S.C.S. § 1983* discrimination claim. *42*

*U.S.C.S. § 1981* is enforced through *42 U.S.C.S. § 1983*.

Labor & Employment Law > ... > Racial Discrimination > Evidence > Mixed Motive

**HN15[⬇]** **Evidence, Mixed Motive**

The plaintiffs must give proper notice when bringing mixed-motive claims.

Constitutional Law > Equal Protection > General Overview

Labor & Employment Law > ... > Evidence > Burdens of Proof > Employee Burdens of Proof

Labor & Employment Law > Discrimination > Reconstruction Statutes

**HN16[⬇]** **Constitutional Law, Equal Protection**

The *Equal Protection Clause, U.S. Const. amend. XIV*, forbids only intentional discrimination. The *Equal Protection Clause* prohibits discrimination by

government which either burdens a fundamental right, targets a suspect class, or intentionally treats one differently than others similarly situated without any rational basis for the difference. To establish an equal protection violation against a public employer in a *42 U.S.C.S. § 1983* action, a plaintiff must show that the employer made an adverse employment decision with a discriminatory intent and purpose. A plaintiff in a *§ 1983* equal protection case must demonstrate that the adverse employment decision would not have occurred but for her protected status. A plaintiff "must do more than just introduce evidence of discriminatory intent and suggest that such intent could have played a role in an adverse employment decision.

Civil Rights Law > ... > Section 1983 Actions > Scope > Elections

Constitutional Law > State Sovereign Immunity > Waiver > General Overview

Governments > State & Territorial Governments > Claims By & Against

**HN17**[⤓] **Scope, Elections**

The *Eleventh Amendment*, *U.S. Const. amend. XI*, bars suits against states and state agencies unless a state has waived its immunity or consented to being sued in federal court. *42 U.S.C.S. § 1983* provides the exclusive remedy for constitutional violations. A litigant complaining of a constitutional right must utilize *42 U.S.C.S. § 1983*. *Section 1983* does not abrogate the sovereign immunity of a State of an agency of the State.

Civil Procedure > ... > Justiciability > Standing > Burdens of Proof

Civil Procedure > ... > Injunctions > Grounds for Injunctions > Likelihood of Success

**HN18**[⤓] **Standing, Burdens of Proof**

Injunctive relief is not justified where there is no showing of any real or immediate threat that the plaintiff will be wronged again. A plaintiff must indicate that it is likely, as opposed to merely speculative,

that a favorable decision would redress plaintiff's injury in order to have standing.

Labor & Employment Law > ... > Racial Discrimination > Evidence > Circumstantial & Direct Evidence

### *HN19*[⬇] Evidence, Circumstantial & Direct Evidence

A plaintiff may prove a claim of intentional discrimination using either direct or circumstantial evidence.

Civil Procedure > Appeals > Appellate Briefs

Civil Procedure > Appeals > Reviewability of Lower Court Decisions > Preservation for Review

### *HN20*[⬇] Appeals, Appellate Briefs

An appellant waives an issue when he fails to present it in his initial briefs before the appellate court.

Evidence > Admissibility > Circumstanti

al & Direct Evidence

Evidence > Inferences & Presumptions > Inferences

### *HN21*[⬇] Admissibility, Circumstantial & Direct Evidence

Direct evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions. Direct evidence does not require a factfinder to draw any inferences.

Evidence > Admissibility > Circumstanti al & Direct Evidence

Labor & Employment Law > ... > Racial Discrimination > Evidence > Circumstantial & Direct Evidence

### *HN22*[⬇] Admissibility, Circumstantial & Direct Evidence

The fact that the statements do not specifically mention the plaintiff means only that they are not direct evidence of discrimination. Statements by decision makers unrelated to the decisional process

itself can not suffice to satisfy the plaintiff's burden of demonstrating animus. A single slur is not direct evidence of discrimination. The repeated usage of racial slurs in this case cannot be termed isolated or abstract.

Labor & Employment Law > ... > Retaliation > Elements > Adverse Employment Actions

Labor & Employment Law > ... > Retaliation > Statutory Application > Reconstruction Statutes

Labor & Employment Law > Discrimination > Retaliation > Burdens of Proof

**HN23**[⬇] **Elements, Adverse Employment Actions**

To make a prima facie case of discrimination under *42 U.S.C.S. § 1983*, the appellant must sufficiently indicate that the employer took an adverse action against them. An adverse action is a materially adverse change in the terms and conditions of the appellant's work; examples include termination of employment, a demotion, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation. De minimis actions are not materially adverse. If every action that made an employee unhappy or resentful was materially adverse, then supervisors could be liable for criticism or even facial expressions indicating displeasure. Otherwise, every trivial personnel action that an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit.

Labor & Employment Law > ... > Retaliation > Elements > Adverse Employment Actions

**HN24**[⬇] **Elements, Adverse Employment Actions**

The United States Supreme Court's decision in Burlington Northern & Santa Fe Railway Company v. White provides for a court to apply a reasonable worker standard: that an adverse action is material

if it would dissuade a reasonable worker from making or supporting a charge of discrimination. Although Burlington Northern certainly expanded the definition of adverse employment action for the purposes of retaliation, it left the term undisturbed in the discrimination context.

Labor & Employment Law > ... > Retaliation > Elements > Adverse Employment Actions

Labor & Employment Law > ... > Employment Practices > Adverse Employment Actions > General Overview

**HN25**[⬇] **Elements, Adverse Employment Actions**

For a disparate-treatment discrimination claim, a mid-range, performance evaluation of fully successful is not an adverse action sufficient to withstand summary judgment.

Civil Procedure > ... > Summary Judgment > Burdens of

Proof > Nonmovant Persuasion & Proof

Evidence > Inferences & Presumptions > Inferences

Civil Procedure > ... > Summary Judgment > Appellate Review > Standards of Review

**HN26**[⬇] **Burdens of Proof, Nonmovant Persuasion & Proof**

When a claim was resolved at the summary judgment stage, the appellate court must draw all reasonable inferences in favor of the non-moving party.

Constitutional Law > Equal Protection > General Overview

Evidence > Burdens of Proof > Allocation

**HN27**[⬇] **Constitutional Law, Equal Protection**

The *Equal Protection Clause, U.S. Const. amend. XIV*, is essentially a direction that all persons similarly situated should be treated alike. A prima facie case of

discrimination requires a plaintiff to show that she was treated differently than others outside of the protected class. To be deemed similarly-situated, the firms with which the plaintiff seeks to compare her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it. The plaintiffs need not demonstrate an exact correlation, but their comparators must be similar in all of the relevant aspects. To have a sufficient comparator, the plaintiff needs to identify a nonprotected firm that engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish its conduct or the employer's treatment of them for it and was subject to the same standards.

Governments > Legislation > Statute of Limitations > Time Limitations

Labor & Employment

Law > ... > Evidence > Burdens of Proof > Burden Shifting

Labor & Employment

Law > Discrimination > Retaliation > Burdens of Proof

**HN28[⤢]** **Statute of Limitations, Time Limitations**

A court analyzes claims under Michigan's Whistleblower Protection Act (WPA), *Mich. Comp. Laws § 15.362*, using the burden-shifting framework for retaliatory discharge claims under the Elliot Larsen Civil Rights Act. Under that framework, a plaintiff first must establish a prima facie case under the WPA. Once a plaintiff has made this showing, the burden of production shifts to the defendant to articulate a legitimate, nonretaliatory explanation for its adverse employment action. If the defendant proffers a legitimate, nonretaliatory reason, the plaintiff then has the opportunity to prove that the defendant's purported legitimate reason was merely pretext for the discharge. To make a prima facie WPA case, the plaintiffs must show: (1) that they were engaged in a protected activity under

the WPA; (2) that they suffered an adverse employment action; and (3) that there is a causal connection between the protected activity and the adverse action. The WPA has a ninety-day statute of limitations. *Mich. Comp. Laws § 15.363(1)*.

Constitutional Law > State Sovereign Immunity > Waiver > General Overview

Governments > State & Territorial Governments > Claims By & Against

*HN29*[⬇] **State Sovereign Immunity, Waiver**

Under the *Eleventh Amendment*, *U.S. Const. amend. XI*, the States' constitutional immunity from suit prohibits all state-law claims filed against a State in federal court, whether those claims are monetary or injunctive in nature.

**Counsel:** For BELLANDRA FOSTER, BBF ENGINEERING SERVICES, PC, Plaintiffs - Appellants: Avery Keith Williams, Teri D. Whitehead, Williams Acosta, Detroit, MI.

For VICTOR JUDNIC, MARK STEUCHER, RICK SNYDER, Governor of the State of

Michigan, KIRK T. STEUDLE, Director of the Michigan Department of Transportation, Defendants - Appellees: Michael J. Dittenber, Assistant Attorney General, Office of the Michigan Attorney General, Lansing, MI.

**Judges:** BEFORE: DAUGHTREY, McKEAGUE, and DONALD, Circuit Judges.

**Opinion by:** Bernice B. Donald

## Opinion

[*379] **Bernice B. Donald, Circuit Judge.** Bellandra Foster ("Foster") and her company BBF Engineering Services, PC ("BBF") (collectively "Appellants") brought myriad claims against a host of defendants, including Rick Snyder, in his official capacity as the Governor of Michigan; Kirk T. Steudle, in his official capacity as the Director of the Michigan Department of Transportation; and two former Michigan Department of Transportation ("MDOT") employees, Victor Judnic and [*380] Mark Stuecher [1]

---

[1] Incorrectly captioned as "Mark Steucher."

(collectively "Appellees"). These claims generally revolve around the theory that certain MDOT employees discriminated against Foster **[\*\*2]** and BBF because she is a black woman and then further retaliated against her when she sought to report their discrimination. On motions from the Appellees, the district court either dismissed or granted summary judgment on all of Appellants' claims. In jumbled filings so replete with errors that they border on being incomprehensible, Foster and BBF now appeal, arguing that the district court should not have granted any of Appellees' dispositive motions and seeking to revive all of their claims. For the following reasons, we **AFFIRM** the district court.

## FACTS

### I. Background

BBF is a consulting firm that provides professional engineering services to clients including MDOT. BBF is certified as a Disadvantaged Business Enterprise ("DBE"),[2] and in 2008, BBF was MDOT's DBE Contractor of the Year. At its largest, BBF once employed seventeen full- and part-time employees. Bellandra Foster is BBF's president and sole shareholder. According to Foster, BBF began performing contract work for MDOT in 1997.

Rick Snyder is Michigan's Governor, and Kirk Steudle is MDOT's director. Both Victor Judnic and Mark Stuecher are former MDOT project engineers. Judnic was a project engineer at the Detroit Transportation Service Center ("TSC") from 2003 until March 2011, when he left MDOT to work in the private sector. From April 2007 until his departure, Judnic was the senior delivery engineer at the Detroit TSC. Stuecher worked for MDOT from 1984 until he moved to a private construction company in December 2010;

_____

[2] "The U.S. Department of Transportation's DBE (disadvantaged business enterprise) program provides a vehicle for increasing the participation by [Minority Business **[\*\*3]** Enterprises] in state and local procurement." United States Dept. of Trans., _Disadvantaged Business Enterprise (DBE) Program_, _http://www.dot.gov/osdbu/disadvantaged-business-enterprise_. "To be certified as a DBE, a firm must be a small business owned and controlled by socially and economically disadvantaged individuals." _Id._

from 1990 until his departure, he worked as a resident engineer.

MDOT awards construction contracts through a competitive bidding process, taking price into account. MDOT also contracts with professional engineering firms and consultants, who provide engineering services such as testing, inspection, and project oversight. MDOT selects its engineering consultants pursuant **[**4]** to the Brooks Act, *40 U.S.C. § 1101*, and picks based on quality, not price. *See generally 23 U.S.C. § 112(b)(2)(A)*. To that end, MDOT circulates a "Selection Guidelines for Service Contracts." To advertise the relevant details and planned scope of proposed contracts, MDOT publishes Requests for Proposals ("RFPs"). Interested firms must submit proposals outlining their qualifications, their personnel, and pertinent information regarding their proposed subconsultants.

When the value of a service contract exceeds $25,000, MDOT uses a selection team to evaluate proposals. The selection team assigns scores to each proposal based on a scoring worksheet, then tallies the scores and forwards them to the Central Selection Review Team in Lansing for final approval. The project manager will then request a "priced proposal" from the highest-scoring firm and start negotiating costs. If these negotiations fall through, **[*381]** MDOT will then turn to the firm with the next-highest rating. Once MDOT and the consultant reach an agreement, they enter into a contract for the project. *See generally 40 U.S.C. §§ 1103(c)-(d), 1104(b)*. Foster claims that in this process the project engineer "has basically the ultimate **[**5]** power" because, according to her, the project engineer helps draft the RFP and largely picks the selection team. She further alleges that the project engineers often decide on the companies with whom they want to work even before the selection committee meets.

## II. Facts Related to the Allegations Against Judnic

Sometime around 2006, Judnic's secretary,

Marilyn Caldwell, heard Judnic say "no woman should be making that kind of money." Caldwell does not recall any details regarding when Judnic made this statement or what she was doing when she heard it. Further, she cannot "say one-hundred percent that it was directed at BBF or at someone else." Caldwell testified that this statement pertained exclusively to sex—not race—and that she cannot recall Judnic ever again making such a statement or any similar statements related to a person's nationality. Although Caldwell explained that she eventually told Foster about this statement, she cannot remember whether she told Foster immediately or even that same year. According to Appellants' theory of the case, this statement clearly referred to Foster—because BBF is one of the few, if not the only, engineering consulting firm owned by a minority **[\**6]** woman—and is the smoking gun that reveals Judnic's race- and sex-based motivation for systematically trying to force BBF out of business.

In 2006, Judnic served as the project manager on an advertised as-needed $4.2 million project, Contract 2006-0490, for which BBF was the highest-scoring consultant. Before contract negotiations moved into the priced-proposal phase, and thus before the contract was actually awarded, Judnic's superiors instructed him to reduce the scope of the proposed work. A $2 million portion of the original project, M-10, was broken off and advertised under a new, separate RFP for which BBF did not submit a proposal. On September 25, 2006, MDOT, through Judnic, awarded the reduced-scope version of Contract 2006-0490, now a roughly $2.2 million project, to BBF. Although Judnic told Foster that the decision to cut the contract came from Lansing, Appellants argue that this reduced contract evinces Judnic's discriminatory intent because no other companies had their contracts cut.

In the evaluation for its work on Contract 2006-0490, BBF received two scores of "7" on a ten-point scale based on a lack of communication and project file deficiencies. Foster believes these **[\**7]** scores were based on the

performance of Love Charles, a long-time BBF employee who worked as an office-technician on the project. Affidavits in the record from several MDOT employees document the issues with Charles's work. In a later meeting on July 18, 2008, Judnic and another MDOT employee, Jason Voigt, met with Foster to discuss BBF's performance on Contract 2006-0490. They also specifically discussed Charles's performance. Appellants nonetheless allege that BBF undeservedly received these negative evaluations and that these evaluations are indicative of discrimination.

Charles acknowledges that Judnic's team had issues with his not logging his calls and failing to keep files up-to-date, but he counters that Judnic treated him like a child. Charles contends that his level of experience was a boon to BBF when it was submitting RFPs; indeed, he **[*382]** told Foster that BBF would be "done" without the added benefits of his experience during the RFP process. Foster testified that she and Charles had spoken about his retirement in late 2007 or early 2008 and that he had informed her of his plans to

retire "shortly after" the July 2008 meeting. On October 1, 2008, Foster emailed Judnic notifying **[**8]** him that Charles would retire on December 17, 2008. Charles contends that his retirement was a result of his being forced out of his job by MDOT employees, particularly Judnic, in an attempt to undercut BBF.

In October 2007, MDOT selected BBF for another as-needed contract at the Detroit TSC, Contract 2008-0044, which was to be managed by Jason Voigt. Voigt contacted Foster to explain that MDOT would be reducing the contract duration from two years to one year. After Foster spoke to Voigt's supervisor, Myron Frierson, however, the contract's duration remained at two years. MDOT awarded BBF the contract on December 11, 2007, and Voigt negotiated the contract's priced proposal with BBF. Although Judnic was neither the original project engineer nor involved in the discussions about reducing the contract's duration, Appellants contend that Judnic somehow played a part in trying to have the contract's scope reduced.

Before the end of Contract 2008-0044, Voigt left MDOT. In his stead, Judnic—with assistance from another MDOT employee, Steve Griffith—assumed the role of project manager. Because she was displeased with the evaluation of her last contract, Foster requested monthly meetings with [**9] Judnic to discuss the progress on this contract. Judnic cannot recall holding such monthly meetings with any other consultant, and Foster was unaware of Judnic's regularly meeting with any other consultant. Regardless, because of his workload, Judnic assigned Griffith to attend the meetings and apprise him of any substantial issues that arose. Foster claims that Judnic simply refused to meet with her, that there must be some reason for this refusal, and that—although she has no evidence to substantiate her suspicion— she believes Judnic's refusal was motivated by her race or gender.

Appellants also contend that Judnic discriminatorily prevented Foster from billing in her capacity as a principal officer for Contracts 2006-0490 and 2008-0044. Although this policy was later changed, at the time of those two contracts, MDOT did not permit a consulting firm's principal officer to bill directly to a project. Based on the policy then in effect, the RFPs for 2006-0490 and 2008-0044 provided that principals and officers were considered an overhead expense and were not to be included in the budgeted hours. Indeed, pursuant to the old policy, BBF's proposal for each of these projects listed Foster [**10] in a non-billable position with zero projected billable hours.

Appellants further claim that they suffered at Judnic's hand because Foster had to file a Freedom of Information Act ("FOIA") request to get the subconsultant evaluations for a project on which BBF was the prime consultant. Foster contends that she had received these evaluations in the past without needing to request them. Foster argues that her needing to file FOIA requests was a symptom of Judnic's discrimination against her, but she admits that she has no evidence that Judnic refused to provide the subconsultant scores because of either her race or gender.

In November 2009, MDOT selected BBF for Contract 2008-0064, for which Tia Klein served as the project manager. Klein requested that one of BBF's employees, Ray Stewart, take a refresher officer-technician training class before working on **[*383]** the contract. Although Stewart normally would not have been required to take the class, Klein explained that she made this request for two reasons: (1) the federal government would be reviewing the project records more closely than usual because the contract used American Recovery and Reinvestment Act ("ARRA") funds; and (2) her review **[**11]** of Stewart's work on another project indicated some deficiencies. Klein and Rita Screws, the Detroit TSC Manager and Judnic's supervisor, were the only two MDOT employees involved in the decision to require additional training for Stewart. Nonetheless, because Judnic was Klein's supervisor, Appellants contend this extra training requirement was a part of Judnic's pattern of discrimination against Foster and BBF.

Appellants also allege that Judnic discriminatorily prevented BBF from being paid as a subconsultant. In 2010, BBF was working as a subconsultant for another consulting firm, URS, on the Gateway Project, for which Judnic was the project manager. BBF was not being paid for the services it rendered, and when Foster explored why, she learned that URS had not been submitting BBF's invoices. In their amended complaint and in their responses to Appellees' motions below, Appellants contended that Judnic discriminatorily played a role in BBF's not being paid because, as the project manager, he reviewed all the invoices that were submitted and he did not question URS about the absence of BBF's invoices. Now, although it is not clear based on their filings, Appellants seem to contend **[**12]** that Judnic received BBF's invoices and discriminated against Foster by refusing to approve them. Regardless, BBF eventually received full payment for the services it rendered after Judnic and Cedric Dargin, another MDOT engineer, investigated the issue.

In an attempt to reduce vehicle costs,

Judnic—with the approval of MDOT and the Office of Commission Audit—introduced a pilot requirement to a 2010 RFP that required the consultant to have a fleet of five leased vehicles. This requirement involved pass-through leases for the vehicles with MDOT ultimately reimbursing the expenses. Any consultant who was interested in the contract had the opportunity to review the requirement and decide whether to submit a proposal for the contract. Because the program received overwhelmingly negative feedback, MDOT did not include the requirement on future projects. Appellants contend that Judnic designed this requirement in an attempt to ensure that contracts only went to large, majority-white engineering consulting firms and to discriminate against BBF specifically because he knew that the company would not be able to lease the necessary vehicles. Appellants underscore this claim by pointing out that **[**13]** Judnic began working for HNTB, the company that was ultimately awarded the contract, after he left MDOT and that Judnic drives a company vehicle.

On June 15, 2010, Foster sent a letter to Tony Kratofil of MDOT regarding Contract 2008-0044. In this letter, Foster expressed concern about MDOT's proposal and evaluation process, particularly in light of the fact that MDOT had rated BBF "the lowest of the entire as-needed services team on two consecutive contracts with the same project manager." Foster explained that she was especially disturbed because she had requested meetings regarding Contract 2008-0044 and had never been told that the management had any major issues. She was concerned because these low scores would influence her future ability to secure work.

## III. Facts Related to the Allegations Against Stuecher

In 2009, BBF submitted a proposal in response to an RFP for an ARRA-funded **[*384]** project from the Oakland TSC. Because it was an ARRA project, the proposals underwent a modified selection process. First, they went to a selection team, comprised of Stuecher, who served

as the project manager, and three other MDOT engineers—Cedric Dargin, Mark Koskinen, and Sean Kerley. The panel would **[\*\*14]** identify the three highest-scoring firms and then move those firms forward for a second round of evaluation. Near the beginning of the selection meeting, Stuecher temporarily left the room. The meeting's attendees differ on the details of what happened next.

According to Dargin, while Stuecher was gone, the panel fully scored all of the proposals, and BBF received the highest score. Dargin claims that when Stuecher returned and saw BBF's score he said, "Oh no, I hate her," and then "unilaterally" reduced BBF's score to prevent BBF from advancing in the selection process. Even after this alleged unilateral change, Dargin nonetheless signed all of the score sheets.

Stuecher claims that he told the other panel members to start reviewing the proposals in his absence with the understanding that the panel would not commence officially scoring until he returned. He testified that when he

returned to the selection meeting, the work was partially done and there were some "scratched out numbers" but that the panel then evaluated the proposals for close to another hour. Stuecher claims they completed the score sheets after the panel reached a consensus regarding each proposal. Stuecher does not **[\*\*15]** remember ever saying, "Oh no, I hate her."

Koskinen's recollection is consistent with Stuecher's. Koskinen remembers the rest of the panel reviewing the proposals after Stuecher left and the entire panel then engaging in discussion after Stuecher returned. Koskinen understood that each panel member's signature on the score sheets indicated that the full panel reached a consensus score.

At the end of this process, BBF was not one of the three highest-scoring firms and therefore did not advance to the next round of consideration. Appellants argue that Stuecher had no basis for personal animus against Foster because Stuecher did not know Foster. From this conclusion,

Appellants extrapolate that Stuecher's alleged comment and reduction of BBF's score must have been the result of race- or sex-based discrimination.

## IV. The Federal Highway Administration Investigation

In July 2010, BBF submitted a number of complaints to the Federal Highway Administration ("FHWA") claiming that MDOT's administration and contract procedures were discriminatory and retaliatory; BBF filed two additional complaints in February 2011. After investigating, the FHWA sent MDOT a "Report of Inquiry" dated October 18, 2011. **[**16]** The initial Executive Summary of the FHWA's report explains that the agency applied a preponderance of the evidence standard, which it defined as "just enough evidence to make it more likely than not that the fact the claimant seeks to prove is true." The report then summarizes:

> In this inquiry, the preponderance of the evidence showed that an MDOT employee willfully removed BBF

Engineering Services P.C. from the top place of a consulting construction award so that Ms. Foster's firm would not be considered.

In addition the evidence shows that based on Ms. Foster's sex (gender) (female) an MDOT employee sent forward her contract to Lansing to have funds removed from it. This resulted in her **[*385]** as-needed service contract being cut in half.

These facts have raised questions in the way service/consulting contracts are awarded at MDOT and the "power" that Project Engineers have in those selections and awards.

It is our belief that MDOT should set up a process improvement team aimed at strengthening MDOT's monitoring of the consulting/service contract award process.

It is our belief that MDOT should meet with Ms. Foster in regards to these issues and reaching a settlement agreement that would be **[**17]** acceptable to both parties.

The report goes on to provide more detailed results of the FHWA's inquiry. It first furnishes the results of investigator Cheryl Hudson's interview with Caldwell, Judnic's former secretary. The report states that, according to Caldwell, Judnic was referring to Foster when he said, "No woman should be making money like that," and that Caldwell did not recall if Judnic said "no Black woman." In her deposition, however, Caldwell explained "that's not how the story goes," that she did not know to whom Judnic had directed his statement, and that she did not think that Judnic made any mention of race or national origin.

The report then notes that, in June 2006, Judnic notified BBF that MDOT was cutting Contract 2006-0940 in half and "rebidding" the M-10 portion of the contract. The report stated that MDOT told Mary Finch, an FHWA investigator, that a committee in Lansing made the decision to "unbundle" larger contracts so that MDOT could create a "viable consultant industry." Finch interviewed Judnic, who, according to the report, told her that, "Lansing wants to provide more opportunities for diverse small consultants[.]" Finch documented her asking Judnic whether **[\*\*18]** he had considered that BBF was a DBE and Judnic's responding that he had not. The report further records MDOT awarded the rebid M-10 portion of the contract to Fishbeck, which at the time was the third-largest consultant doing business with MDOT.

From the investigation, the FHWA concluded that the "preponderance of the evidence" indicated that Judnic "appear[ed] to have taken actions based on Ms. Foster sex (gender) (female)." The FHWA saw a connection between Judnic's stating "[n]o woman should make that amount of money," and his later acting in a way that "suggest[ed]" that BBF's contracts "go forward as contracts that could be cut." The FHWA also concluded that the MDOT offices in Lansing were sending mixed messages about what it wanted to accomplish by re-advertising parts of contracts. The FHWA stated that Judnic "thought he was supposed to be obtaining more diversity in his contracting

opportunities and he cho[se] to break out [of] a contract that was already awarded to a DBE," and "[t]he result was that a large white[-]owned firm was awarded the second half of the contract." Judnic, for his part, complained that Finch's questions were vague, that she refused to provide any context **[**19]** or clarification for her questions, and that the FHWA report bolstered its conclusions using only portions of quotations and quotations taken out of context.

Stuecher was not interviewed during the FHWA investigation. The report nonetheless concludes that "MDOT (Mr. Mark Stuecher) willfully changed the scores on the sheet to remove BBF Engineering from the top three . . . It is unclear as to motive." The FHWA requested that MDOT "form a process improvement team aimed at strengthening MDOT's monitoring **[*386]** of the consulting/service contract award process."

## V. MDOT's Audit

During the course of the ensuing litigation,

MDOT conducted an audit of BBF. Appellants contend that this audit is retaliation for their filing suit and that the auditing department's exclusive motive was for MDOT to be able to conclude that Appellants were making too much money. MDOT, however, explains that the Office of Commission Audit had planned to audit BBF as a part of its annual audit plan as far back as October 2009, well before Appellants filed suit.

## PROCEDURAL HISTORY

Appellants filed their initial complaint in the United States District Court for the Eastern District of Michigan on November 3, 2011—less than a month **[**20]** after the FHWA issued its October 18, 2011 report. In this complaint, Appellants alleged that Judnic, Stuecher, the State of Michigan, and MDOT had discriminated and retaliated against them in violation of Title VI, _42 U.S.C. § 2000d_; _42 U.S.C. §§ 1981 and 1983_; and Michigan's Whistleblower Protection Act ("WPA"), _Mich. Comp. Laws § 15.362_.

573 Fed. Appx. 377, *386L 2014 U.S. App. LEXIS 13785, **20

All of the defendants filed *Fed. R. Civ. P. 12(b)(6)* motions to dismiss for failure to state a claim. The district court granted the State of Michigan's and MDOT's motions to dismiss in full, finding that Title VI did not extend to gender discrimination, that BBF had not stated plausible claims of race-based discrimination or retaliation under Title VI, and that *Eleventh Amendment* immunity precluded the remainder of the claims against them. The district court likewise dismissed the individual-capacity Title VI claims against Judnic and Stuecher because individuals cannot be held liable under Title VI. The district court rejected Appellants' argument for equitable tolling and concluded that a three-year statute of limitations applied to Appellants' federal claims. Finally, the district court also dismissed the various official-capacity claims against **[\*\*21]** Judnic and Stuecher because either the defendants were immune or the claims were redundant and duplicative. After dismissal of these claims, the only claims that remained were the individual capacity *§ 1983* and WPA claims against Judnic and Stuecher.

Appellants later moved to amend their complaint to include additional *§ 1983* claims and to renew their Title VI claims against Michigan and MDOT. The district court granted this motion in part. The district court found that Appellants' new proposed due process claims were futile and denied reinstatement of the Title VI claims. This district court did, however, allow Appellants to add a *§ 1983* race-discrimination claim under the *Fourteenth Amendment's Equal Protection Clause*. On reconsideration, the district court again dismissed the equal protection claims against the State of Michigan and MDOT on the grounds of immunity. Instead of those claims, the district court permitted Appellants to sue Governor Rick Snyder and MDOT Director Kirk Steudle in their official capacities for prospective injunctive relief under *§ 1983*. The record indicates, however, that BBF never served either of these new parties with a complaint or summons.

After discovery, **[\*\*22]** the remaining defendants moved for summary judgment. The district court granted this motion,

holding that Appellants lacked evidence that BBF was treated differently from similarly situated consulting firms. The district court dismissed the official-capacity claims for prospective relief because Appellants' constitutional rights were not violated and **[*387]** found four separate bases for dismissing the WPA claims. This appeal ensued.

## ANALYSIS

Distilling their arguments down to a more manageable form, Appellants essentially contend that the district court reversibly erred in a six ways: (1) by dismissing their Title VI claims because they did not plausibly state an allegation of race-based discrimination and because Title VI does not apply to gender discrimination or vicarious liability claims; (2) by finding that MDOT and the State of Michigan were entitled to *Eleventh Amendment* Immunity from Appellants' *§ 1983* claims; (3) by granting summary judgment to Snyder and Steudle, in their official capacities, because Appellants failed to produce evidence of an

ongoing violation such that prospective injunctive relief would be appropriate; (4) by granting summary judgment on Appellants' *§ 1983* equal **[**23]** protection claims against Judnic and Stuecher individually because Appellants failed to present facts indicating that Judnic or Stuecher had treated any similarly situated firms differently from BBF; (5) by granting summary judgment to Judnic and Stuecher on Appellants' WPA claims; and (6) by denying Appellants' motion to amend their complaint to add a due process claim as futile because they failed to identify a constitutionally protected liberty or property interest.

We review all of these claims de novo. *See, e.g., Back v. Nestlé USA, Inc., 694 F.3d 571, 575 (6th Cir. 2012)* (stating that *HN1*[⬆] we review a district court's grant of summary judgment de novo); *Scott v. Ambani, 577 F.3d 642, 646 (6th Cir. 2009)* (noting that we review a district court's dismissal de novo); *Inge v. Rock Fin. Corp., 281 F.3d 613, 625 (6th Cir. 2002)* (explaining that *HN2*[⬆] we typically review the denial of a motion to amend for abuse

of discretion but that we review de novo a denial on the basis of futility).

## I. Title VI Claims

Appellants contend that the district court erroneously dismissed their sex- and race-based discrimination and retaliation claims under Title VI. *HN3*[↑] To survive a *Fed. R. Civ. P. 12(b)(6)* motion to **[\*\*24]** dismiss, a claim's "factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the allegations in the complaint are true." *Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)* (internal citations and emphasis omitted). This assumption that all the complaint's allegations are true does not, however, apply to legal conclusions or to legal conclusions cloaked as fact. *Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)*. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* Further still, "where the well-pleaded facts

do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id. at 679* (quoting *Fed. R. Civ. P. 8(a)(2)*).

A. Gender-based Discrimination under Title VI

Title VI of the Civil Rights Act of 1964 *HN4*[↑] states: "No person **[\*\*25]** in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." *42 U.S.C. § 2000d*. As a matter of plain language, Title VI does address discrimination on the basis of sex or gender. *See id. HN5*[↑] "[W]hen the statutory **[\*388]** language is plain, we must enforce it according to its terms." *Jimenez v. Quarterman, 555 U.S. 113, 118, 129 S. Ct. 681, 172 L. Ed. 2d 475 (2009)*.

*HN6*[↑] Because it does not say anything about sex or gender, the text of *42 U.S.C.*

*§ 2000d* itself compels us to conclude that Title VI does not provide a cause of action for gender discrimination. Two of our sister circuits have reached the same conclusion. *See, e.g.,* *Shannon v. Lardizzone, 334 F. App'x 506, 507 n.1 (3d Cir. 2009)*; *Davis v. Monroe Cnty. Bd. of Educ., 120 F.3d 1390, 1396 (11th Cir. 1997)*, *rev'd on other grounds*, *526 U.S. 629, 119 S. Ct. 1661, 143 L. Ed. 2d 839 (1999)*. Moreover, dicta from Supreme Court cases contrasting Title VI with Title IX of the Educational Amendments of 1972, *20 U.S.C. § 1681*, suggests that Title VI is not applicable to gender discrimination. *See* *Alexander v. Sandoval, 532 U.S. 275, 297, 121 S. Ct. 1511, 149 L. Ed. 2d 517 (2001)* **[\*\*26]** (referring to Title IX, which addresses gender discrimination in educational settings, as Title VI's "gender-based twin"); *Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 286, 118 S. Ct. 1989, 141 L. Ed. 2d 277 (1998)* (stating Title VI is "parallel to Title IX except that it prohibits race discrimination, not sex discrimination"); *N. Haven Bd. of Educ. v. Bell, 456 U.S. 512, 523 n.13, 102 S. Ct.*

*1912, 72 L. Ed. 2d 299 (1982)* (noting that there had been proposed legislation to "extend[] the prohibitions of Title VI . . . to discrimination based on gender . . ." but that this proposal "never emerged [from] the committee").

In the face of this plain language, persuasive authority from our sister circuits, and confirming dicta from the Supreme Court, BBF attempts to read *23 U.S.C. § 324*—a wholly separate statute that addresses gender discrimination in federally funded contracts—in a manner that extends Title VI's coverage to prohibit discrimination based on gender, as well as presumably disability, age, and religion. This reading is unpersuasive because nothing in the text of *23 U.S.C. § 324* suggests that it affects the coverage of Title VI. Further, Appellants cite no, and indeed we have not found any, authority supporting this expansive reading of *§ 324*. **[\*\*27]** Appellants also argue that *42 U.S.C. § 2000d-7* **HN7**[⬆] provides a cause of action for a gender-based Title VI claim. Again, this argument is unpersuasive. That statute indicates that Congress intended to

abrogate states' sovereign immunity and to provide remedies under Title VI, among other civil-rights statutes. *See Alexander, 532 U.S. at 280*. Section 2000d-7, however, does not affect the substance of Title VI. Because Title VI only applies to discrimination on the basis of race, color, or national origin, the district court properly dismissed Appellants' gender-based Title VI claims.

B. Race-based Discrimination under Title VI

[HN8[↑]] Title VI targets intentional discrimination only. *Alexander, 532 U.S. at 280*. Appellants, however, fail to plead any plausible claims of intentional discrimination. Rather, Appellants' Title VI race-discrimination claims consist of nothing more than legal conclusions such as "Plaintiffs have been denied participation based upon race, color, national origin, and gender." These conclusory allegations of race discrimination are insufficient. [HN9[↑]] "[A] complaint that includes conclusory allegations of discriminatory intent without additional supporting details does not sufficiently [**28] show that the pleader is entitled to relief." *Nali v. Ekman, 355 F. App'x 909, 913 (6th Cir. 2009)*; *see also Iqbal, 556 U.S. at 680*. Similarly, the Appellants' allegations that Foster belongs to a suspect class and that [*389] BBF is owned by a member of a suspect class— while true—do not state a claim of racially motivated discrimination. *See Rondigo, L.L.C. v. Twp. of Richmond, 641 F.3d 673, 680-81 (6th Cir. 2011)*; *accord Ashcroft, 556 U.S. at 680*.

Even if Appellants had managed to articulate a plausible claim based on the actions of Judnic or Stuecher, which they have not, Appellants likely would not be able to establish Title VI liability for MDOT or the State of Michigan under a theory of respondeat superior. [HN10[↑]] In *Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 290-91, 118 S. Ct. 1989, 141 L. Ed. 2d 277 (1998)*, the Supreme Court held that vicarious liability was not available under Title IX and that a supervisory entity must have had knowledge of and been deliberately indifferent to an employee's

discriminatory actions. The *Gebser* court reasoned that Title IX was a conditional statute rather than a prohibitory statute, so primary enforcement rested within the jurisdiction of the funding agency. *Id. at 286-88*. **[\*\*29]** Title VI contains a similar administrative enforcement provision. *Compare 20 U.S.C. § 1682 with 42 U.S.C. § 2000d-1*. Beyond this similar language, the *Gebser* court recognized that Title VI and Title IX "operate in the same manner." *524 U.S. at 286*. Accordingly, *Gebser*'s interpretation that there is no vicariously liability under Title IX supports the notion that there is no vicarious liability under Title VI. *See Zeno v. Pine Plains Cent. Sch. Dist., 702 F.3d 655, 665 n.10 (2d Cir. 2012)*.

Appellant's complaint does not contain any fact-based allegations that either MDOT or the State of Michigan participated in, was aware of, or was deliberately indifferent to any discriminatory acts. Because the complaint fails to offer any plausible race-based Title VI claims, the district court properly dismissed them. *See Iqbal, 556 U.S. at 680* (citing *Twombly, 550 U.S. at 570*).

## C. Title VI Retaliation

The district court reasoned it was implausible that Appellants' filing Title VI complaints was causally related to BBF's struggling to secure contracts given that BBF's difficulties preceded its complaints by several years, and as such, the district court dismissed Appellants' Title VI retaliation claims. **[\*\*30]** Appellants argue that we may infer that any action after the date of the complaints to the FHWA was retaliatory. Appellants, however, fail to offer any allegations in the original complaint to support a retaliation claim. Instead, they recite the law without any application to the facts and then demand reversal. We are well within our rights to determine that Appellants forfeited appellate review of their retaliation claims by only giving this issue a cursory acknowledgment. *E.g., Williamson v. Recovery Ltd. P'ship, 731 F.3d 608, 621 (6th Cir. 2013)* **HN11** ("Issues adverted to in a perfunctory manner, without some effort to develop an

argument, are deemed forfeited").[3]

## D. Official-Capacity Claims Under Title VI

**HN12**[🔼] A plaintiff may only assert Title VI claims against "the entity . . . receiving the **[*390]** financial assistance." *Buchanan v. City of Bolivar, Tenn., 99 F.3d 1352, 1357 (6th Cir. 1996)*; *see also Shannon, 334 F. App'x at 508*. On appeal, Appellants challenge the dismissal of the official capacity suits against Judnic and Stuecher. Official-capacity claims are "in all respects other than name, to be treated as a suit against the entity." *Kentucky v. Graham, 473 U.S. 159, 165, 105 S. Ct. 3099, 87 L. Ed. 2d 114 (1985)*. Where the entity is named as a defendant, an official-capacity claim is redundant. *E.g., Faith Baptist Church v. Waterford Twp., 522 F. App'x 322, 327 (6th Cir. 2013)* ("Having sued . . . the entity for which [plaintiff] was an agent, the suit against [plaintiff] in his official

capacity was superfluous."). Here, because Appellants named MDOT and the State of Michigan as defendants, their official-capacity suits against Judnic and Stuecher are superfluous. Because the Title VI claims against the State and MDOT fail, Appellants' official-capacity claims against Judnic and Stuecher necessarily also fail. *See Jackson v. Wilkins, 517 F. App'x 311, 321 (6th Cir. 2013)*; **[**32]** *Chesher v. Neyer, 477 F.3d 784, 797 (6th Cir. 2007)*.

## II. *42 U.S.C. § 1983* Claims

*42 U.S.C. § 1983* **HN13**[🔼] provides a civil cause of action for plaintiffs who have been deprived of rights:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party

---

[3] Because Appellants did not claim that MDOT's audit of BBF was retaliatory in the district court, we need not rule on this claim. *See Coach, Inc. v. Goodfellow, 717 F.3d 498, 502 (6th Cir. 2013)* ("Ordinarily, we will not address issues raised for the first time on appeal.") (citing *McFarland v. Henderson, 307 F.3d 402, 407 (6th Cir. 2002)*). Nonetheless, we note that even if the issue were properly before us, we would find that Appellants still failed to allege a plausible retaliation claim and thus that this claim was properly **[**31]** dismissed.

injured in an action at law, suit in equity, or other proper proceeding for redress . . . . Injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable . . . .

Appellants brought claims under *§ 1983*— as well as *42 U.S.C. § 1981* [4]—against Judnic and Stuecher, both in their official capacities and individually; the State of Michigan; MDOT; and eventually Snyder, in his official capacity as Governor, and Steudle, in his official capacity as the director of MDOT, all of which were resolved in favor of the Appellees either on motions to dismiss or motions for summary judgment. On **[**33]** appeal, Appellants attempt to revive all of these claims.

Although Appellants did not bring a claim under a mixed motive theory below, they now contend that "at best, this is a mixed motive case." We decline to consider this argument. *HN15*[↑] "Plaintiffs must give proper notice when bringing mixed-motive claims." *Spees v. James Marine, Inc., 617 F.3d 380, 390 (6th Cir. 2010)*. Because Appellants did not give proper notice or make a mixed-motive argument below, they have forfeited this theory on appeal. *See, e.g.*, *Blackshear v. Interstate Brands Corp., 495 F. App'x 613, 617 (6th Cir. 2010)*; *Hashem-Younes v. Danou Enters., Inc., 311 F. App'x 777, 779 (6th Cir. 2009)*.

After seemingly casting BBF as in a "class of **[**34]** one" in their opening brief, Appellants now deny characterizing themselves as a "class of one." Accordingly, the question that remains before us is whether Appellants raise a genuine issue **[*391]** of material fact indicating that any of the Appellees intentionally discriminated against them on the basis on race or gender in violation of the *Equal Protection Clause of the Fourteenth Amendment*. *E.g. Horner v. Ky. High Sch. Athletic Ass'n, 43 F.3d 265, 267 (6th Cir. 1994)* ("The *Equal Protection Clause HN16*[↑] forbids only intentional

---

[4] Although Appellants attempted to bring their *§ 1981* claims as independent actions, *42 U.S.C. § 1981 HN14*[↑] does not contain a private remedy. Rather, it is essentially part and parcel of Appellants' 1983 claim. *See Thompson v. City of Lansing, 410 F. App'x 922, 934 (6th Cir. 2011)* (stating that a *§ 1981* claim is analyzed using the same framework as a *§ 1983* discrimination claim); *McCormick v. Miami Univ., 693 F.3d 654, 660-61 (6th Cir. 2010)* (explaining that *§ 1981* is enforced through *§ 1983*).

discrimination.").

"The *Equal Protection Clause* prohibits discrimination by government which either burdens a fundamental right, targets a suspect class, or intentionally treats one differently than others similarly situated without any rational basis for the difference." *Rondigo, L.L.C. v Township of Richmond, 641 F.3d 673, 681 (6th Cir. 2011)* (citations omitted). "[T]o establish an equal protection violation against a public employer in a *section 1983* action, a plaintiff must show that the employer made an adverse employment decision 'with a discriminatory intent and purpose.'" *Boger v. Wayne Cnty., 950 F.2d 316, 324-25 (6th Cir. 1991)* (quoting *Charles v. Baesler, 910 F.2d 1349, 1356-57 (6th Cir.1990)).*

 **[**35]** A plaintiff in a *§ 1983* equal protection case must demonstrate that the adverse employment decision would not have occurred but for her protected status. *Id. at 325*. A plaintiff "must do more than just introduce evidence of discriminatory intent and suggest that 'such intent could have played a role in an adverse employment decision . . . .'" *Id.* (quoting

*Gutzwiller v. Fenik, 860 F.2d 1317, 1325 (6th Cir. 1988)).* As a black woman, Foster is a member of a protected class for both race and gender. *See Oliver v. St. Luke's Dialysis LLC, 491 F. App'x 586, 587 (6th Cir. 2012)* (citations omitted). At this stage, she must point to evidence that Appellees took adverse actions against her because she was a member of a protected class.

A. *Section 1983* Claims against the State of Michigan and MDOT

The district court dismissed Appellants' *§ 1983* claims against the State and MDOT on the basis of the Supreme Court's holding in *Will v. Michigan Department of State Police, 491 U.S. 58, 67, 71, 109 S. Ct. 2304, 105 L. Ed. 2d 45 (1989)*, that the *Eleventh Amendment* **HN17**[⬆] bars suits against states and state agencies unless a state has waived its immunity or consented to being sued in federal court. Appellants contend that the district court erred  **[**36]** in dismissing their *§ 1983* claims, as well as their attempted direct constitutional claims, against these entities.

To the extent that Appellants attempt to

assert direct constitutional claims, they fail; we have long held that *§ 1983* provides the exclusive remedy for constitutional violations. *Thomas v. Shipka, 818 F.2d 496, 503 (6th Cir. 1987)*, *vacated on other grounds*, *488 U.S. 1036, 109 S. Ct. 859, 102 L. Ed. 2d 984 (1989)*; *accord Azul-Pacifico, Inc. v. City of Los Angeles, 973 F.2d 704, 705 (9th Cir. 1992)* ("[A] litigant complaining of a constitutional right must utilize *42 U.S.C. § 1983*."). Appellants' *§ 1983* claims likewise fail. *Section 1983* did not abrogate the sovereign immunity of either the State of Michigan or MDOT. *Quern v. Jordan, 440 U.S. 332, 345, 99 S. Ct. 1139, 59 L. Ed. 2d 358 (1979)*. Furthermore, neither the State nor MDOT qualify as "persons" under *§ 1983*. *Will, 491 U.S. at 71*. The district court did not err in dismissing the *§ 1983* claims against MDOT and the State of Michigan.

B. *Section 1983* Claims Against Snyder and Steudle in their Official Capacities

After dismissing the *§ 1983* claims against the State of Michigan and MDOT for a second time, the district court permitted

**[*392]** Appellants to substitute Governor Snyder and Director Steudle **[**37]** in their official capacities and to seek prospective injunctive relief against them under *Ex Parte Young, 209 U.S. 123, 28 S. Ct. 441, 52 L. Ed. 714 (1908)*. The record does not indicate, however, that Appellants ever served summons on complaints on Snyder or Steudle. Appellants contend that they have constructively served Snyder and Steudle because the Office of the Michigan Attorney General represents all of the defendants. We look askance at this argument. Even presuming that Snyder and Steudle had been properly served, the district court did not err in granting summary judgment on these official-capacity claims. Dismissing the claims against all of the individual defendants necessarily defeats the official-capacity claims against Snyder and Steudle. *See Scott v. Clay County, 205 F.3d 867, 879 (6th Cir. 2000)* (explaining that dismissal of all the individual claims a fortiori defeats the claims against the entity) (citations omitted). Even if this were not so, Appellants cannot sustain their *§ 1983*

claims against Snyder and Steudle based on a theory of supervisory liability. *See Moniz v. Cox, 512 F. App'x 495, 499 (6th Cir. 2013)* ("General allegations of Cox's failure to supervise and investigate are insufficient **[**38]** to state a claim[.]").

Appellants also fail to indicate how prospective injunctive relief would be appropriate in this case. They have not identified any remediable ongoing violations of law beyond conclusory statements that prospective injunctive relief would be appropriate. *See Terrance v. Northville Reg. Psych. Hosp., 286 F.3d 834, 842 (6th Cir. 2002)* (stating that "violations of constitutional rights cannot be founded upon conclusory, vague or general allegations"). Appellants' inability to point to an impending wrongdoing undercuts their claims against Snyder and Steudle. *See Los Angeles v. Lyons, 461 U.S. 95, 111, 103 S. Ct. 1660, 75 L. Ed. 2d 675 (1983)* (stating that *HN18*[↑] injunctive relief is not justified where "there is no showing of any real or immediate threat that the plaintiff will be wronged again"). Similarly, Appellants fail to explain how prospective relief would remedy any of its alleged injuries beyond speculating that BBF would receive more contracts in the future once MDOT's selection process were changed. *Cf. Lujan v. Defenders of Wildlife, 504 U.S. 555, 561, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992)* (explaining that a plaintiff must indicate that it is "likely"—as opposed to "merely speculative"—that a favorable decision would redress **[**39]** plaintiff's injury in order to have standing). The district court did not err in granting summary judgment on the official-capacity claims against Snyder and Steudle.

C. *Section 1983* Claims Against Judnic

*HN19*[↑] A plaintiff may prove a claim of intentional discrimination using either direct or circumstantial evidence. *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp., 176 F.3d 921, 926 (6th Cir. 1999)*. The district court concluded that Appellants could not prove that Judnic violated their equal protection rights using either direct or circumstantial evidence; on appeal, Appellants contend that they have

sufficiently pointed to enough both direct or circumstantial evidence to sustain their *§ 1983* claim against Judnic.

As a preliminary matter, we note that many of Appellants' purported pieces of evidence fall after the limitations date—November 3, 2008—that the district court imposed when it rejected Appellants' request for equitable tolling. Because Appellants did not challenge this holding in their brief, we consider it waived. *Marks v. Newcourt Credit Grp., Inc., 342 F.3d 444, 462 [*393] (6th Cir. 2003)* **HN20**[↰] ("An appellant waives an issue when he fails to present it in his initial briefs before [**40]** this court."). Based on this limitations period, several pieces of evidence from Appellants' complaints below and their briefs here are untimely—including the scope and billing of Contract 2006-0490, which was awarded September 25, 2006; the scope and billing of Contract 2008-0044, which was awarded December 11, 2007; and Charles's retirement, which was announced on October 1, 2008. Still, even considering all of this untimely evidence,

Appellants' *§ 1983* claims against Judnic fail.

1. *Direct Evidence of Judnic's Discrimination*

**HN21**[↰] "[D]irect evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Jacklyn, 176 F.3d at 926*. Direct evidence "does not require a factfinder to draw any inferences." *Johnson v. Kroger Co., 319 F.3d 858, 865 (6th Cir. 2003)*.

Appellants contend that Judnic's saying "no woman should be making that kind of money" amounts to direct evidence of sex-based discrimination. This argument has several fatal defects. First, this statement was isolated and ambiguous—particularly given Caldwell's inability to recall its details. As such, it does not constitute direct evidence **[**41]** of discrimination. *See Phelps v. Yale Sec., Inc., 986 F.2d 1020, 1025-26 (6th Cir. 1993)*. Nothing in the statement indicates that it was made regarding Foster or BBF. *See Griffin v. Finkbeiner, 689 F.3d 584, 595 (6th Cir.*

2012) HN22[↑] ("The fact that the statements do not specifically mention [plaintiff] means only that they are not direct evidence of discrimination . . . .").

Also, Judnic did not make this statement in the context of an evaluation or other adverse employment action. "Statements by decision makers unrelated to the decisional process itself can not suffice to satisfy the plaintiff's burden of demonstrating animus." *Bush v. Dictaphone Corp., 161 F.3d 363, 369 (6th Cir. 1998)* (quoting *Price Waterhouse v. Hopkins, 490 U.S. 228, 277, 109 S. Ct. 1775, 104 L. Ed. 2d 268 (1989)* (O'Connor, J., concurring)) (internal quotation marks and alterations omitted). If comments suggesting animus were present, we then would consider whether Judnic took an adverse action "because of [his] predisposition to discriminate" against a protected class. *DiCarlo v. Potter, 358 F.3d 408, 416 (6th Cir. 2004)*. Given that—even in Caldwell's fuzzy recollection—this statement was singular, there is no evidence in the record that Judnic harbored **[**42]** animus. *Compare Hopkins*

*v. Elec. Data Sys. Corp., 196 F.3d 655, 661 (6th Cir. 1999)* (finding that a single slur was not direct evidence of discrimination) *with Talley v. Bravo Pitino Restaurant, Ltd., 61 F.3d 1241, 1249 n.2 (6th Cir. 1995)* ("[T]he repeated usage of racial slurs in this case cannot be termed isolated or abstract.").

Finally, the timing of the statement— sometime in 2006 and thus roughly three years before the evaluation and two years before a timely claim could have accrued— undercuts finding that it is direct evidence. *See Hein v. All Am. Plywood Co., Inc., 232 F.3d 482, 489 (6th Cir. 2000)* (explaining that comments made five months before an employee's termination were too far removed to be direct evidence); *Phelps, 986 F.2d at 1026* (stating that comments made "nearly a year" before an adverse action "were made too long before . . . to have influenced the . . . decision"); *but see DiCarlo, 358 F.3d at 416* (holding that racial slurs made three weeks before termination constituted direct evidence). The district court did not err in concluding that Appellants' failed to point to direct

evidence of Judnic's discrimination.

[*394] 2. *Circumstantial Evidence of Judnic's Discrimination*

*HN23*[↑] To [**43] make a prima facie case of discrimination under *§ 1983*, Appellants must sufficiently indicate that Judnic took an adverse action against them. *See, e.g., Rushton v. City of Warren, 90 F. App'x 912, 916 (6th Cir. 2004); Policastro v. N.W. Airlines, Inc., 297 F.3d 535, 539 n.1 (6th Cir. 2002)*. An adverse action is "a materially adverse change in the terms and conditions" of Appellants' work; examples include "termination of employment, a demotion . . . a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Hollins v. Atl. Co., Inc., 188 F.3d 652, 662 (6th Cir. 1999)*. *De minimis* actions are not materially adverse. As we explained fifteen years ago, if every action that made an employee "unhappy or resentful" was materially adverse, then supervisors could be liable for "criticism or even facial expressions indicating displeasure." *Primes v. Reno, 190 F.3d 765, 766 (6th Cir. 1999)*; *accord Williams v. Bristol-Myers Squibb Co., 85 F.3d 270, 274 (7th Cir. 1996)* ("Otherwise, every trivial personnel action that an irritable, chip-on-the-shoulder employee did not like would [**44] form the basis of a discrimination suit."). Appellants' circumstantial evidence of discrimination fails to indicate that Judnic was "personally involved in the alleged misconduct." *Miller v. Calhoun Cnty., 408 F.3d 803, 817 n.3 (6th Cir. 2005)*.

For example, in 2010 when BBF was not being paid for its work as a subconsultant on the Gateway Project, Appellants do not dispute that the delay in payment was because URS—the prime consultant— initially failed to submit BBF's invoices to Judnic. Appellant's point to this temporary nonpayment as an adverse action, contending that Judnic neglected to investigate this issue promptly or thoroughly. This argument is flawed for several reasons. First, this allegation

appears to be less of a claim of intentional discrimination and more of a claim sounding in negligence. Second, this claim appears indistinguishable from *Rasins Landscape & Assocs., Inc. v. MDOT, 528 F. App'x 441 (6th Cir. 2013)*, where we held that an MDOT subcontractor lacked standing to bring a claim against MDOT for a prime contractor's failure to pay contract proceeds. *Id. at 444-45*.

Appellants' other aspects of circumstantial evidence fail to indicate that Judnic took a materially **[**45]** adverse action against them. Many of Appellants' other pieces of evidence— including having to submit a FOIA request to see subconsultant evaluations, Judnic's holding a telephonic meeting instead of an in-person one, and Judnic's having another engineer meet with Foster—fall into the category of *de minimis* actions that are not materially adverse. *See Primes, 190 F.3d at 766*. Further, Appellants contend that Judnic took a materially adverse action by requiring extra training for Stewart. Unrefuted evidence in the record, however, indicates that Judnic had no hand in this requirement.

Appellants also contend that Judnic took a materially adverse action against them by inserting the leased-vehicle requirement into an RFP in 2010. This requirement, however, was not materially adverse because it applied across-the-board to any consultant who wished to submit a proposal for the project.

Appellants' strongest adverse action argument is Judnic's giving BBF two "7 out of 10" scores in his evaluation of BBF's performance on Contract 2006-0490. Indeed, the district court found that this evaluation was materially adverse. To reach this conclusion, the district court **[*395]** relied on our decision in *Blizzard v. Marion Technical College, 698 F.3d 275, 290 (6th Cir. 2012)*, **[**46]** which in turn relies on *HN24*[↑] the Supreme Court's decision in *Burlington Northern & Santa Fe Railway Company v. White, 548 U.S. 53, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006)*, to apply a "reasonable worker" standard— that an adverse action is material if it would dissuade a reasonable worker from making or supporting a charge of discrimination.

Appellees, however, contend that the district court relied on the incorrect definition of "adverse action." They assert that *Burlington Northern* established the reasonable worker standard for retaliation but did not relax the standard for disparate-treatment. We agree; although *Burlington Northern* certainly expanded the definition of adverse employment action for the purposes of retaliation, it left the term undisturbed in the discrimination context. *See Tepper v. Potter, 505 F.3d 508, 515 n.1 (6th Cir. 2007)* (explaining that *Burlington Northern* expanded the definition of "adverse employment action for a Title VII retaliation claim" but that "*Burlington Northern* did not expand or alter this Court's formulation of an adverse employment action for purposes of the discrimination claim before us" (internal citations and quotation marks omitted)); *Michael v. Caterpillar Fin. Servs. Corp., 496 F.3d 584, 595-96 (6th Cir. 2007)* **[**47]** (emphasizing the distinction between a prima facie discrimination claim and a prima facie retaliation claim).

**HN25**[↑] For a disparate-treatment discrimination claim, a "mid-range, performance evaluation of 'fully successful'" is not an adverse action sufficient to withstand summary judgment. *Primes, 190 F.3d at 766*; *see also James v. Metro. Gov't of Nashville, 243 F. App'x 74, 79 (6th Cir. 2007)* (noting that an adverse evaluation did not constitute a materially adverse action before *Burlington Northern*). Judnic's assigning BBF two scores of seven on a one-to-ten scale appears decidedly mid-range. But even if this evaluation did indicate that BBF had not been fully successful, Appellants would still need to indicate that they "suffered, or [are] in jeopardy of suffering," a concrete action "because of the downgraded evaluation." *Morris v. Oldham Cnty. Fiscal Court, 201 F.3d 784, 789 (6th Cir. 2000)*. Unless this negative evaluation had palpable negative effects, it is not actionable. *See Vaughn v. Louisville Water Co., 302 F. App'x 337, 348 (6th Cir. 2008)*; *Morris, 201 F.3d at 789*; *cf. White v. Baxter Healthcare Corp., 533 F.3d 381, 403 (6th Cir. 2008)* ("By receiving a lower salary increase than **[**48]** he would have

without the more negative evaluation, White was denied an increase in pay to which he allegedly was entitled.").

Appellants fail to identify any contracts that BBF and Foster were not awarded as a result of either the evaluation for Contract 2006-0490 or Judnic's conduct generally. Foster does offer some highly speculative testimony claiming that BBF was not awarded contracts because of Judnic's actions, but a plaintiff's subjective beliefs are "wholly insufficient evidence to establish a claim of discrimination." *Mitchell v. Toledo Hosp., 964 F.2d 577, 584 (6th Cir. 1992)*; *see also* *Shaheen v. Naughton, 222 F. App'x 11, 13-14 (2d Cir. 2007)* (affirming summary judgment where a plaintiff "merely speculates that her failure to secure another residency must have been a result of negative evaluations"). Rather, Appellants acknowledge that BBF struggled to obtain work before Judnic's evaluation and, conversely, that a panel chaired by Judnic selected BBF for a contract after this evaluation. Additionally, "Past Performance" ratings on BBF's pre- and post-evaluation proposals remained largely consistent.

**[*396]** Because Appellants do not offer evidence that Judnic's evaluation either **[**49]** was noticeably worse than prior evaluations or that it meaningfully affected BBF's ability to secure future work, this evaluation does not constitute a materially adverse action. Because Appellants do not sufficiently assert that Judnic took a materially adverse action against them, their disparate-treatment-based equal protection claim against Judnic fails.[5]

## D. *Section 1983* claims against Stuecher

Appellants do not appear to challenge the district court's holding that Stuecher's alleged statement—"I hate her"—was not direct evidence of either race or gender discrimination. We therefore only analyze whether the district court erroneously concluded that Appellants did not put forth a prima facie *§ 1983* disparate-treatment claim using circumstantial evidence. *HN26*[

---

[5] Based on this holding, we need not examine whether Appellants can point to evidence that Judnic treated any similarly situated consulting firms differently. Nonetheless, we note that Appellants are unable to do so for the reasons explained below in the next section, addressing whether Appellants can identify any similarly situated consulting firms that Stuecher treated differently.

⬆] As this claim was resolved at the summary judgment **[\*\*50]** stage, we must draw all reasonable inferences in favor of the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)*. Accordingly, although the record is conflicted regarding whether Stuecher unilaterally changed BBF's evaluation scores during the selection process for the 2009 ARRA contract, we assume that he did at this stage. This modification of BBF's scores such that BBF did not progress to the second round of evaluation constitutes a materially adverse action. To prevail on their *§ 1983* disparate treatment claim, however, Appellants must also indicate that Stuecher treated BBF differently from other similarly situated consulting firms.

The *Equal Protection Clause* **HN27**[⬆] is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Ctr., 473 U.S. 432, 439, 105 S. Ct. 3249, 87 L. Ed. 2d 313 (1985)*. A prima facie case of discrimination requires a plaintiff to show that she was treated differently than others outside of the protected class. *See, e.g., Younis v. Pinnacle Airlines, Inc., 610 F.3d 359, 363 (6th Cir. 2010)*. "[T]o be deemed 'similarly-situated', the [firms] with [which] the plaintiff seeks to compare **[\*\*51]** [her] treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Mitchell v. Toledo Hosp., 964 F.2d 577, 583 (6th Cir. 1992)*. Appellants "need not demonstrate an exact correlation," but their comparators "must be similar in 'all of the *relevant* aspects.'" *Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 352 (6th Cir. 1998)* (emphasis in original) (quoting *Pierce v. Commonwealth Life Ins. Co., 40 F.3d 796, 802 (6th Cir. 1994))*.

The district court found that Appellants had, at best, identified three alleged comparators—Wade Trim Associates, HNTB, and Great Lakes Engineering—but that Appellants did not provide any factual

bases to support a finding that these firms were similarly situated. Appellants now claim both that there are no firms comparable to BBF and that all the "majority" consulting firms—HNTB; Fishbeck, **[\*397]** Thompson, Carr & Huber; Great Lakes Engineering; URS Corporation; and Wade Trim Associates— are similarly situated. Moving beyond the inconsistency of this argument, **[\*\*52]** because Appellants did not assert that all of these firms were similarly situated in the district court, we need not consider these new arguments. *See Coach, 717 F.3d at 502*.

We nevertheless note that Appellants have not presented sufficient evidence to indicate that any of these firms are similarly situated. To have a sufficient comparator, Appellants need to identify a nonprotected firm that "engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish [its] conduct or the employer's treatment of them for it" and was "subject to the same standards." *Mitchell, 964 F.2d at 577*. Appellants offer no evidence regarding the

experience, qualifications, or size of these supposedly similarly situated firms beyond conclusory statements that the firms were similarly situated.

Indeed, of all the firms that Appellants attempt to use as comparators, only two— HNTB and URS—submitted proposals for the 2009 ARRA contract. Although HNTB was more highly scored than BBF and did ultimately receive the contract, the record does not support Appellant's contention that BBF and HNTB are similarly situated with regard to the 2009 ARRA contract. Turning to URS, even **[\*\*53]** if it were similarly situated (and nothing in the record indicates that it is), it still would not make for an apt comparator because URS actually received lower scores than BBF.

In sum, Appellants have not satisfied the similarly-situated element for a prima facie case of *§ 1983* discrimination. They have not offered evidence that Great Lakes, HNTB, Wade Trim, or any other "majority" firm dealt with the same supervisors, offered substantially similar proposals to MDOT, had substantially similar employee

573 Fed. Appx. 377, *397; 2014 U.S. App. LEXIS 13785, **53

teams, or had substantially similar evaluations and scores as they were going into the 2009 ARRA evaluation process. Accordingly, Appellants have not satisfied the elements of a prima facie case, and the district court properly granted summary judgment to Stuecher on this claim.

E. Due Process Claims under § 1983

The district court denied Appellants leave to add a § 1983 due process claim regarding Judnic's "low" evaluation to their amended complaint. The district court found that this amendment would be futile because BBF did not have a constitutionally protected liberty or property interest in an evaluation or a protected interest in MDOT's contracting procedures. Giving Appellants every **[\*\*54]** benefit of the doubt, they appear to challenge this ruling on appeal by claiming that BBF was entitled to contracts which were awarded and then wrested away. This cursory argument does not identify any specific contracts that were "wrested away." Based on our best guess, Appellants are referring to the M-10 portion of Contract 2006-0490

that was split away and awarded to another firm. If so, that claim would fail because BBF could not have had a property interest in the contract since it was not yet "actually awarded" when its scope was reduced. *See United of Omaha Life Ins. Co. v. Solomon, 960 F.2d 31, 34 (6th Cir. 1992)*; *see also 40 U.S.C. § 1104(b)*. Moreover, this claim from 2006 would fall outside of § 1983's three-year statute of limitations. Accordingly, the district court properly concluded that this claim would be futile.

## III. Claims under the Michigan Whistleblower Protection Act

The district court found four independent grounds on which to grant summary judgment on Appellants' individual-capacity **[\*398]** WPA claims against Judnic and Stuecher: (1) BBF and Foster were not "employees" of MDOT; (2) Appellants did not identify an adverse action taken within the WPA's ninety-day statute **[\*\*55]** of limitations; (3) Appellants failed to identify any adverse actions taken after Foster

573 Fed. Appx. 377, *398; 2014 U.S. App. LEXIS 13785, **55

engaged in a protected activity; and (4) Appellants did not identify any adverse actions Judnic or Stuecher took after they knew the protected activity. Appellants challenge all of these findings and assert that factual issues preclude summary judgment.

**HN28**[↑] We analyze claims under Michigan's WPA using the burden-shifting framework for retaliatory discharge claims under the Elliot Larsen Civil Rights Act. *See Taylor v. Modern Eng'g, Inc., 252 Mich. App. 655, 653 N.W.2d 625, 628 (Mich. Ct. App. 2002)*; *accord Pethers v. Metro Lift Propane, No. 09-CV-10516, 2010 U.S. Dist. LEXIS 76776, 2010 WL 3023887, at *6 (E.D. Mich., July 29, 2010)*. Under this framework, a plaintiff first must establish a prima facie case under the WPA. *E.g., West v. Gen. Motors Corp., 469 Mich. 177, 665 N.W.2d 468, 471-72 (Mich. 2003)*. Once a plaintiff has made this showing, the burden of production shifts to the defendant to articulate a legitimate, nonretaliatory explanation for its adverse employment action. *E.g., Roulston v. Tendercare (Michigan), Inc., 239 Mich. App. 270, 608 N.W.2d 525, 530 (Mich. Ct. App. 2000)*. If the defendant proffers a legitimate, nonretaliatory reason, the plaintiff then has the opportunity **[**56]** to prove that the defendant's purported legitimate reason was merely pretext for the discharge. *Taylor, 653 N.W.2d at 628* (citing *Roulston, 608 N.W.2d at 530*).

To make a prima facie WPA case, Appellants must show: (1) that they were engaged in a protected activity under the WPA; (2) that they suffered an adverse employment action; and (3) that there is a causal connection between the protected activity and the adverse action. *West, 665 N.W.2d at 471-72*. Assuming for the sake of argument that Foster and BBF were MDOT employees, Appellants have nonetheless failed to assert a prima facie WPA case against Judnic or Stuecher. Foster's filing complaints with the FHWA satisfies the protected activity prong of a prima facie WPA case. Appellants, however, stumble at the second and third prongs. The WPA has a ninety-day statute of limitations. *Mich. Comp. Laws § 15.363(1)*. Although they claim that there

are questions of fact regarding this statute of limitations, Appellants do not identify any adverse actions that Judnic or Stuecher allegedly took after Foster first filed her complaints in June 2010. Accordingly, the district court properly concluded that Appellants have not sufficiently alleged [**57] a causal connection between any adverse actions by Judnic and Stuecher and Foster's filing Title VI complaints with the FHWA.

Appellants also challenge the district court's dismissal of their WPA claims against MDOT, the State of Michigan, and Judnic and Stuecher in their official capacities. Appellants acknowledge that the *Eleventh Amendment* bars suits for damages against a state in federal court but then argue, "However, this does not preclude non-equitable relief. Plaintiffs may proceed against the State and its agencies with their WPA claims." This statement is both befuddling and flatly wrong; *HN29*[↑] under the *Eleventh Amendment*, "the States' constitutional immunity from suit prohibits all state-law claims filed against a State in federal court, whether those claims

are monetary or injunctive in nature." *Ernst v. Rising, 427 F.3d 351, 368 (6th Cir. 2005)*. The district court properly dismissed these claims.

## [*399] CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's dismissal of Appellants' claims.

**End of Document**



## *Graham v. Best Buy Stores, L.P.*

United States Court of Appeals for the Sixth Circuit

October 22, 2008, Filed

File Name: 08a0645n.06

No. 07-4139

### Reporter

298 Fed. Appx. 487 *; 2008 U.S. App. LEXIS 22224 **; 104 Fair Empl. Prac. Cas. (BNA) 1623; 2008 FED App. 0645N (6th Cir.)

MICHAEL GRAHAM, Plaintiff-Appellant, v. BEST BUY STORES, L.P., Defendant-Appellee.

**Notice:** CONSULT 6TH CIR. R. 32.1 FOR CITATION OF UNPUBLISHED OPINIONS AND DECISIONS.

**Prior History: [**1]** ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO.

*Graham v. Best Buy Stores, L.P., 2007 U.S. Dist. LEXIS 110118 (N.D. Ohio, Aug. 14, 2007)*

### Core Terms

Buy, summary judgment, termination, display, theft, probable cause, purchase order, mixed-motive, prima facie case, indictment, quotation, alleges, marks, non discriminatory reason, retaliation, defamation, malice, box, intentional infliction of emotional distress, discrimination claim, qualified privilege, license plate, new computer, replacement, employees, discount

### Case Summary

#### Procedural Posture

Plaintiff former employee filed suit against defendant former employer for a racially discriminatory termination, retaliation, wrongful discharge, abuse of process, malicious prosecution, defamation, and intentional infliction of emotional distress.

The United States District Court for the Northern District of Ohio granted summary judgment to the employer and dismissed the former employee's claims. He appealed.

## Overview

Plaintiff complained to human resources about the disparate treatment of African-American and Caucasian employees and customers. Store employees discovered a cash shortage. A security video showed an African-American man who resembled plaintiff taking money out of a register. Plaintiff was arrested for theft. The prosecutor dropped all charges against him. He sued the employer for retaliation, wrongful discharge, abuse of process, malicious prosecution, intentional infliction of emotional distress, and punitive damages. The district court properly granted summary judgment. The employer asserted a legitimate nondiscriminatory reason for terminating the employee, because he violated the employee-discount policy. He did not produce evidence to show that his termination was motivated in part by race. He did not make

a sufficient showing of pretext to overcome the employer's proffered, legitimate, and non-discriminatory reason for reporting him to the police. He failed to allege sufficient facts to show that the employer acted with an ulterior motive, that he was prosecuted without probable cause, or that he suffered severe emotional distress or damage.

## Outcome

The district court's grant of summary judgment was affirmed.

## LexisNexis® Headnotes

Civil Procedure > Appeals > Standards of Review > De Novo Review

Civil Procedure > ... > Summary Judgment > Appellate Review > Standards of Review

## *HN1*[⤓] **Standards of Review, De Novo Review**

The United States Court of Appeals for the Sixth Circuit reviews de novo the district court's grant of summary judgment.

Summary judgment is proper when the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(c)*. When reviewing a motion for summary judgment, facts and inferences must be viewed in the light most favorable to the party opposing the motion.

Labor & Employment
Law > ... > Evidence > Burdens of
Proof > Burden Shifting

*HN2*[⤓] **Burdens of Proof, Burden Shifting**

Single-motive discrimination claims are evaluated using the burden-shifting analysis detailed in McDonnell Douglas. To proceed on a race-discrimination claim, the plaintiff must establish a prima facie case of discrimination by showing that: (1) he was a member of a protected class; (2) he suffered an adverse employment action; (3) he was qualified for the position; and (4) he was replaced by someone outside

the protected class or was treated differently than similarly-situated, non-protected employees.

Civil Procedure > ... > Summary
Judgment > Entitlement as Matter of
Law > General Overview

Labor & Employment
Law > ... > Evidence > Burdens of
Proof > Burden Shifting

Labor & Employment Law > ... > Racial
Discrimination > Evidence > Mixed
Motive

*HN3*[⤓] **Summary Judgment, Entitlement as Matter of Law**

The McDonnell Douglas burden-shifting framework does not apply to mixed-motive claims. A mixed-motive discrimination claim survives summary judgment if there are any genuine issues of material fact concerning the employer's motivation for its adverse employment decision. This burden is not onerous and should preclude sending the case to the jury only where the record is devoid of evidence that could

reasonably be construed to support the employer's claim.

Labor & Employment Law > ... > Retaliation > Elements > General Overview

### *HN4*[⬇] **Retaliation, Elements**

Absent direct evidence, a claim of retaliatory termination in violation of Title VII of the Civil Rights Act of 1964, *42 U.S.C.S. § 2000e-3(a)*, is analyzed under the McDonnell Douglas framework. To proceed on this claim, the plaintiff must establish a prima facie case of retaliation by producing evidence that: (1) he engaged in protected activity, (2) the employer knew of the exercise of the protected right, (3) an adverse employment action was subsequently taken against the employee, and (4) there was a causal connection between the protected activity and the adverse employment action.

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Genuine Disputes

Civil Procedure > ... > Summary Judgment > Burdens of Proof > Nonmovant Persuasion & Proof

### *HN5*[⬇] **Entitlement as Matter of Law, Genuine Disputes**

Summary judgment requires the nonmoving party to set out specific facts showing a genuine issue for trial. *Fed. R. Civ. P. 56(e)(2)*.

Labor & Employment Law > Discrimination > Retaliation > General Overview

### *HN6*[⬇] **Discrimination, Retaliation**

The anti-retaliation provision is not limited to discriminatory actions that affect the terms and conditions of employment.

Torts > Intentional Torts > Abuse of Process > Elements

### *HN7*[⬇] **Abuse of Process, Elements**

In Ohio, the tort of abuse of process has three elements: (1) that a legal proceeding has been set in motion in proper form and

with probable cause; (2) that the proceeding has been perverted to attempt to accomplish an ulterior purpose for which it was not designed; and (3) that direct damage has resulted from the wrongful use of process. An abuse-of-process claim will not survive a motion to dismiss when it is supported only by conclusory allegations regarding the defendants' ulterior motives with no facts to support those contentions. There is no liability for abuse of process where the defendant has done nothing more than carry out the process to its authorized conclusion, even though with bad intentions.

Torts > ... > Elements > Lack of Probable Cause > Evidence

Torts > ... > Malicious Prosecution > Elements > Malice

*HN8*[ ] **Lack of Probable Cause, Evidence**

In Ohio, the elements of the tort of malicious criminal prosecution are: (1) malice in instituting or continuing the

prosecution, (2) lack of probable cause, and (3) termination of the prosecution in favor of the accused. Malice is defined as an improper purpose or any purpose, other than the legitimate interest of bringing an offender to justice. However, if the lack of probable cause is demonstrated, the legal inference may be drawn that the proceedings were actuated by malice. Probable cause for this purpose is defined as a reasonable ground of suspicion, supported by circumstances sufficiently strong in themselves to warrant a cautious individual in the belief that the person accused is guilty of the offense with which he or she is charged.

Torts > ... > Elements > Lack of Probable Cause > Evidence

*HN9*[ ] **Lack of Probable Cause, Evidence**

For purposes of an Ohio malicious-prosecution claim, an indictment is prima facie evidence of probable cause and a plaintiff must bring forward substantial evidence to rebut this. A plaintiff can rebut

an indictment by showing that the return of the indictment resulted from perjured testimony or that the grand jury proceedings were otherwise significantly irregular.

Torts > ... > Defamation > Elements > General Overview

### HN10[⬇] Defamation, Elements

In Ohio, the elements of defamation are: (a) a false and defamatory statement concerning another; (b) an unprivileged publication to a third party; (c) fault amounting at least to negligence on the part of the publisher; and (d) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication.

Torts > ... > Defenses > Privileges > Qualified Privileges

### HN11[⬇] Privileges, Qualified Privileges

Ohio law provides qualified privilege for disclosures when circumstances exist, or are reasonably believed by the defendant

to exist, which cast on him the duty of making a communication to a certain other person to whom he makes such communication in the performance of such duty, or where the person is so situated that it becomes right in the interests of society that he should tell third persons certain facts, which he in good faith proceeds to do.

Torts > ... > Defenses > Privileges > Qualified Privileges

### HN12[⬇] Privileges, Qualified Privileges

The Ohio Supreme Court held that qualified privilege shields individuals who report information about public-work contracts to government officials. It is in society's interest that people reporting crimes to the police be similarly protected.

Civil Procedure > Judgments > Summary Judgment > General Overview

Torts > Intentional Torts > Intentional Infliction of Emotional

Distress > Elements

*HN13*[⤓] **Judgments, Summary Judgment**

To survive summary judgment on a claim of intentional infliction of emotional distress, a plaintiff must show that: (1) defendant intended to cause emotional distress, or knew or should have known that their actions would result in the plaintiff's serious emotional distress, (2) defendant's conduct was extreme and outrageous, (3) defendant's actions proximately caused the plaintiff's emotional injury, and (4) the plaintiff suffered serious emotional anguish.

Torts > Intentional Torts > Intentional Infliction of Emotional Distress > Elements

*HN14*[⤓] **Intentional Infliction of Emotional Distress, Elements**

The defendant must act with more than criminal intent, and that to be liable for the tort of intentional infliction of emotional distress, the defendant's conduct must

have been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community.

**Counsel:** For MICHAEL GRAHAM, Plaintiff - Appellant: Nancy C. Schuster, Kami D. Rowles, Schuster & Simmons, Cleveland, OH.

For BEST BUY STORES, L.P., Defendant - Appellee: David A. Campbell, III, Matthew D. Besser, Vorys, Sater, Seymour & Pease, Cleveland, OH.

**Judges:** Before: MOORE and COOK, Circuit Judges; and HOOD, * District Judge.

**Opinion by:** KAREN NELSON MOORE

**Opinion**

 **[\*491] KAREN NELSON MOORE, Circuit Judge.** Plaintiff-Appellant Michael Graham ("Graham") appeals the district court's grant of summary judgment to

_____

* The Honorable Joseph M. Hood, United States District Judge for the Eastern District of Kentucky, sitting by designation.

Defendant-Appellee Best Buy Stores, L.P. ("Best Buy"). Graham, a former Best Buy employee, seeks relief in connection with his termination and events that transpired soon after. Graham appeals the dismissal of his claims of racially discriminatory termination, retaliation, wrongful discharge, abuse of process, malicious prosecution, defamation, and intentional infliction of emotional distress.

We **AFFIRM** the district court's grant of summary judgment.

## I. BACKGROUND

[1]

Graham, an African-American man, was hired by Best Buy in 1997. Over the next few years, he worked for Best Buy on and off in different states in varying positions. In 2004, a former Best Buy co-worker, Marc Rankin ("Rankin"), recruited him to work for

Best Buy in Mayfield, Ohio. Graham moved to Ohio, and when Rankin became General Manager of a new Best Buy store in Macedonia, Ohio, he hired Graham as the PC Area Manager to help open the store. In February 2005, Graham "began to complain to Best Buy management and Human Resources about the disparate treatment between African-American and Caucasian employees and customers." Joint Appendix ("J.A.") at 28 (Fed. Compl. P 13-14). Among other things, Graham complained that the hours of African-American employees were cut while the hours of Caucasian employees were not, that job qualifications were required of African-American job applicants but not Caucasian ones, **[**3]** and that Rankin tried to charge an African-American customer returning a television a restocking fee that he had not assessed against Caucasian customers. [2]

In April 2005, another manager at the Macedonia Best Buy found a computer,

---

[1] Many of the facts in this case are in dispute. Because **[**2]** we are reviewing the grant of a motion for summary judgment, this section will describe the facts in the light most favorable to Graham. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)*; *Blair v. Henry Filters, Inc., 505 F.3d 517, 520 n.1 (6th Cir. 2007)*.

[2] Best Buy argues that Graham made only two complaints. Graham also asserts that Rankin publicly embarrassed him when Graham asked for personal leave while not doing this to a white employee, and that another employee made racist remarks about African-American customers.

monitor, and partially completed purchase order set aside at the front of the store. The price listed on the purchase order showed a deduction greater than the approved employee discount. The computer was not in a box, and it had a Best Buy "license plate" attached to it. Best Buy affixes license plates to display items for identification. The purchase order indicated that the computer had been a display item. However, the computer that was found at the front of the store was not a display computer; it was new. The display computer that the license plate properly belonged to was found in the new computer's box.

When this computer and purchase order were found and connected with Graham, **[*492]** Tim Collins **[**4]** ("Collins"), the district loss-prevention manager, investigated. Graham admits that he removed the new computer from its box, put the display computer in the box, and set the new computer aside to purchase for himself. He also admits that he wrote the purchase order. However, Graham says that he was planning to buy the display

computer when a co-worker told him that there was a new one in the back. He decided to buy the new computer instead, and he put the display one in the box so that it could be returned to the vendor per Best Buy policy. He says that he wrote a second purchase order, which Best Buy did not find, reflecting the proper price. He also denies switching the license plate from one computer to another.

On April 22, 2005, after confronting him with the information they had uncovered about what they viewed as an attempt to get an improper discount, Rankin and Collins terminated Graham "without any required input from Human Resources." [3] Appellant Br. at 10.

On May 9, 2005, employees at a Best Buy store in Elyria, Ohio discovered a cash shortage. Collins **[**5]** investigated and reviewed the security video. In the video, Collins observed an African-American man who resembled Graham appear to use a key to take money out of a cash register,

_____

[3] Collins states that he consulted human resources, but a human resources official does not remember whether he called her.

something Graham (and likely any other Best Buy store employee) would have known how to do. After confirming his identification of the man on the video as Graham with Rankin and an employee who had been in the store on the evening of the theft, Collins reported the theft to the police and notified them that he suspected Graham.

Graham was arrested in connection with this theft on June 15, 2005, and was indicted on August 3, 2005. On May 9, 2006, after being advised that there were other suspects, the prosecutor dropped all charges against Graham. While embroiled in this criminal process, Graham pursued his civil complaints against Best Buy. After being terminated, he complained to human resources. On May 26, 2005, Graham filed charges with the Ohio Civil Rights Commission. He received a right to sue letter from the Equal Employment Opportunity Commission dated June 1, 2006.

In May 2006, Graham sued Best Buy in the Court of Common Pleas, alleging defamation and seeking punitive damages. In June 2006, Best Buy **[**6]** filed a notice of removal. In August 2006, Graham filed suit against Best Buy in the U.S. District Court for the Northern District of Ohio. This suit included state and federal discrimination claims; state and federal retaliation claims; claims of wrongful discharge, abuse of process, malicious prosecution, and intentional infliction of emotional distress; and sought punitive damages. On April 10, 2007, these cases were consolidated. [4]

On June 25, 2007, Best Buy filed a motion for summary judgment. On August 14, 2007, the district court issued its opinion granting summary judgment to Best Buy on all counts. Graham timely filed his notice of appeal.

## [*493] II. ANALYSIS

---

[4] Graham's state suit was brought against two John Does in addition to Best Buy, and his federal suit was filed against three John Does as well as Best Buy. Neither party discusses these John Does, and the district court noted that they were "never served, never more fully identified, they never appeared, and they have not been a factor in this case." J.A. at 45 (Dist. Ct. Op. at 1). Having no further information about them, we will not consider the John Does.

## A. Standard of Review

**HN1**[↑] We review de novo the district court's grant of summary **[**7]** judgment. *Blair, 505 F.3d at 523*. Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c)*. When reviewing a motion for summary judgment, facts and inferences "'must be viewed in the light most favorable to the party opposing the motion.'" *Matsushita, 475 U.S. at 587* (quoting *United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S. Ct. 993, 8 L. Ed. 2d 176 (1962))*.

## B. Discrimination Claims

Graham asserts that Best Buy terminated him because of his race in violation of *42 U.S.C. § 2000e-2(a)* ("Title VII"). [5] Graham

also raises a mixed-motive discrimination claim under *42 U.S.C. § 2000e-2(m)*.

## 1. Single-Motive Claims

**HN2**[↑] Single-motive claims are evaluated using the burden-shifting analysis detailed by the Supreme Court in *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 801-05, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)*. *See also Wright v. Murray Guard, Inc., 455 F.3d 702, 706 (6th Cir. 2006)*. To proceed on this race-discrimination claim, Graham must establish a prima facie case of discrimination by showing that: "'(1) he . . . was a member of a protected class; (2) he . . . suffered an adverse employment action; (3) he . . . was qualified for the position; and (4) he . . . was replaced by someone outside the protected class or was treated differently than similarly-situated, non-protected employees.'" *Wright, 455 F.3d at 707* (quoting *DiCarlo v.*

---

[5] The parties dispute whether Graham has appealed the dismissal of his parallel state-law claims of discrimination brought under *Ohio Rev. Code § 4112.02*. We have noted that the elements of a discrimination case are the same under federal Title VII law and Ohio law, so both can be considered together. *Staunch v. Cont'l Airlines, Inc., 511 F.3d 625, 631 (6th Cir. 2008)* ("The Ohio Supreme Court has held that federal case law interpreting **[**8]** Title VII . . . is generally applicable to cases alleging violations of R.C. Chapter 4112." (internal quotation marks omitted)); *Knox v. Neaton Auto Prods. Mfg., Inc., 375 F.3d 451, 457 (6th Cir. 2004)*. Graham's state-law claims survive or fail with his federal claims.

*Potter, 358 F.3d 408, 415 (6th Cir. 2004))*. The first three elements are undisputed on appeal. [6] As to the fourth element, Graham asserts that Best Buy replaced him with a white male. Best Buy argues that Graham **[**9]** has no personal knowledge of this fact and has introduced no admissible evidence regarding his replacement. However, Best Buy "does not deny this fact, has submitted no evidence to refute it, and has made no statements regarding [Graham's] replacement." **[*494]** *Wright, 455 F.3d at 707*. In these circumstances, an employee's "assertion regarding his replacement suffices to sustain a prima facie case" on summary judgment. *Id.*

As Graham has sufficiently alleged a prima facie case, the burden shifts to Best Buy to produce a legitimate, non-discriminatory reason for Graham's termination. *McDonnell Douglas, 411 U.S. at 802-03*. Best Buy alleges that Graham was terminated for violating the store's employee-discount policy. Best Buy's Employee Handbook and its Conduct Guidelines for Managers, which Graham signed, state that violating the employee-discount policy is a serious offense which "would likely lead to termination for a first offense." J.A. at 197, 245 (Best Buy Emp. Handbook at 42; Conduct Guidelines for Managers).

Because Best Buy has asserted a legitimate nondiscriminatory reason for terminating Graham, the burden of production shifts back to Graham to produce evidence showing that this reason is pretextual. *McDonnell Douglas, 411 U.S. at 804*. We have held that "for an employer to avoid a finding that its claimed nondiscriminatory reason was pretextual, the employer must be able to establish its reasonable reliance on the particularized facts that were before it **[**11]** at the time the decision was made." *Wright, 455 F.3d*

---

[6] In its motion for summary judgment, Best Buy alleged that Graham could not prove that he was qualified for the job because he attempted to abuse the employee-discount process. The district court agreed with this argument. J.A. at 53-54 (Dist. Ct. Op. at 9-10). However, Best Buy contends that its nondiscriminatory reason for terminating Graham was this computer switch. As Graham properly notes, "a court may not consider the employer's alleged nondiscriminatory reason for taking an adverse employment action when analyzing the prima facie case." *Wexler v. White's Fine Furniture, Inc., 317 F.3d 564, 574 (6th Cir. 2003)* (en banc). It was error for the district court to consider Best Buy's alleged nondiscriminatory reason for discharging Graham while analyzing his prima facie **[**10]** case. Best Buy offers no other evidence to show that Graham was unqualified, and Graham satisfies the third element of the prima facie case.

at 708 (internal quotation marks omitted). Best Buy's investigation process need not have been perfect, but its decision must have been "reasonably informed and considered." Id. (internal quotation marks omitted). Best Buy does not need to prove that Graham violated or intended to violate the discount policy, only that Best Buy "made its decision to terminate [Graham] based on an honestly held belief in a nondiscriminatory reason supported by particularized facts after a reasonably thorough investigation." Id. at 709.

Best Buy has offered evidence that it investigated the matter and that it reasonably relied on the facts before it. [7] Graham argues that he put the display

––––––––––––––––––––––––

[7] When Graham was terminated, Best Buy had the following information: (1) a computer and purchase order listing a discount that was too steep for that merchandise had been found at the front of the store; (2) the computer was new, contrary to indications on the purchase order; (3) an identification tag (the "license plate") normally attached only to display items had been affixed to this new computer; (4) this particular license plate belonged to a computer that had been on display but had been moved to this new computer; (5) the display computer that once bore this license plate was found in the box that originally belonged to the new computer; (6) Graham admitted that he had set the computer aside, that he had put the display computer in the new computer's box's box in order to return the display [**13] unit, that he wrote the purchase order that had been found with the computer, and that he intended to purchase the computer once Rankin approved the price. Collins interviewed employees, tested the computer to see if it was new, checked the license plate, and spoke with Graham before Graham was terminated.

computer in the new box in order to return it to the distributor per Best Buy policy, that he did not "switch" the license plate, and that the purchase order found by Best Buy was not the purchase order he had written out for the new computer, but rather one he had written when he thought he was going to be purchasing a display model. He also notes that he did not purchase the computer and that Rankin did not consult human resources before terminating him. None of [**12] this evidence, however, suffices to show that Best Buy lacked an "honestly held belief in a nondiscriminatory reason supported by particularized facts after a reasonably thorough investigation." Id. Under these circumstances, Graham has not made a sufficient showing that Best Buy's nondiscriminatory reason was pretextual, [*495] and summary judgment on the single-motive race-discrimination claim is proper.

## 2. Graham's Mixed-Motive Claim

Graham also raises a mixed-motive race-discrimination claim under 42 U.S.C. §

2000e-2(m). **HN3**[↑] The *McDonnell Douglas* burden-shifting framework does not apply to mixed-motive claims. *White v. Baxter Healthcare Corp., 533 F.3d 381, 401-02 (6th Cir. 2008)*; *Wright, 455 F.3d at 711-13*. A mixed-motive discrimination claim survives summary judgment if "there are any genuine issues of material fact concerning [Best Buy's] motivation for its adverse employment decision." *White, 533 F.3d at 402*. This burden "is not onerous and should preclude sending the case to the jury only where the record is devoid of evidence that could reasonably be construed to support [Graham's] claim." *Id. at 400*.

While it is a close question, Graham's mixed-motive claims do not survive this low burden. The fact that he has established a prima facie case under the *McDonnell Douglas* framework **[**14]** can be considered in favor of his mixed-motive claims. *Id. at 401*. However, most of Graham's allegations regarding discrimination go to show that he did not violate the employee-discount policy rather than that race was a motive in his termination. He argues that a similarly situated white employee was punished less harshly than he was. To compare his treatment with that of this white employee, Graham must show that there are no relevant differences between their conduct. *Wright, 455 F.3d at 709-10*. **[**15]** The other employee's separation notice makes it clear that Graham's conduct was not similar. Best Buy alleges that Graham attempted to purchase a new computer at a discount greater than that offered to employees. However, the separation notice for the other employee indicates that Best Buy warned and later fired this other employee because he was accruing Best Buy Reward Zone benefits on purchases he made, a violation of company policy. Best Buy could choose to have a policy that an employee who planned to purchase merchandise at an improperly low price should be punished more harshly than one who attempted to earn additional perks on a purchase he made with his legitimate employee discount.

The burden to establish a mixed-motive discrimination claim is not onerous, but

ultimately Graham has not "produced evidence from which a jury can logically infer" that Best Buy's termination was motivated in part by race. *White, 533 F.3d at 404*. Summary judgment on this claim is proper.

## C. Retaliation Claims [8]

### 1. Retaliatory-Termination Claims

Graham appeals the grant of summary judgment on his claims of retaliatory termination in violation of *42 U.S.C. 2000e-3(a)*. **HN4** Absent direct evidence, this claim is analyzed under the *McDonnell Douglas* framework detailed above. *See Abbott v. Crown Motor Co., 348 F.3d 537, 542 (6th Cir. 2003)*. To proceed on this claim, Graham must establish a prima facie case of retaliation by producing evidence that: "(1) he . . . engaged in protected activity, (2) the employer knew of the exercise of the protected right, (3) an adverse employment action was subsequently taken against the employee, and (4) there was a causal connection between the protected activity and the adverse employment action." *Niswander v. Cincinnati Ins. Co., [*496] 529 F.3d 714, 720 (6th Cir. 2008)*. Graham asserts that he repeatedly complained to Rankin about discriminatory conduct toward African-Americans and that Rankin fired him shortly thereafter. [9]

Assuming that Graham has established a prima facie case, we conclude that he cannot "demonstrate by a preponderance of the evidence that the legitimate reason offered by [Best Buy] was in fact only a pretext to mask retaliation." *Id.* Best Buy asserts that Graham was terminated

---

[8] The parties dispute whether Graham has appealed the grant of summary judgment on his state-law retaliation claims under *Ohio Rev. Code § 4112.02*. These types of state and federal claims can **[**16]** be considered together. *Staunch, 511 F.3d at 631*; *Knox, 375 F.3d at 457*. Graham's state-law claims survive or fail with his federal claims.

[9] The district court opinion rejected Graham's retaliation claim on the grounds that he only showed a temporal link **[**17]** between his complaints and his termination and that such a connection is insufficient to establish a causal link. However, this court has held that "[w]here an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation." *Mickey v. Zeidler Tool & Die Co., 516 F.3d 516, 525 (6th Cir. 2008)*. We explained that "if an employer immediately retaliates against an employee upon learning of his protected activity, the employee would be unable to couple temporal proximity with any such other evidence of retaliation because the two actions happened consecutively, and little other than the protected activity could motivate the retaliation." *Id.*

because he attempted to abuse the employee-discount policy. As in **[\*\*18]** the discrimination context, Graham has provided no evidence that his dismissal was retaliatory and that Best Buy's proffered legitimate reason was pretextual. **HN5[↑]** Summary judgment requires the nonmoving party to "set out specific facts showing a genuine issue for trial," and Graham has failed to do that. *Fed. R. Civ. P. 56(e)(2)*.

## 2. Retaliatory-Criminal-Process Claims

Graham alleges that Best Buy identified him to the police regarding the theft at the Elyria store because of his complaints about race discrimination. The same framework used in the previous section regarding retaliatory termination applies to this claim. As above, we will assume that Graham has sufficiently alleged that he engaged in protected activity and that Best Buy took adverse action against him. *See Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 63-64, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006)* ("[T]he **HN6[↑]** anti-

retaliation provision . . . is not limited to discriminatory actions that affect the terms and conditions of employment."). Taking the facts in the light most favorable to Graham, he has shown that Rankin and Collins knew about his protected activity before he was accused of the theft. Graham has established temporal proximity between his actions **[\*\*19]** and his arrest, which can satisfy the causal-connection requirement. *Mickey, 516 F.3d at 525*.

To prevail on its motion for summary judgment, Best Buy does not have to prove that Graham actually committed the alleged theft or show that its investigation was perfect; it need only show that it decided to report Graham to the police "based on an honestly held belief in a nondiscriminatory reason supported by particularized facts after a reasonably thorough investigation." *Wright, 455 F.3d at 709*. Before alerting the police, Collins reviewed the security video which showed an African-American man who appeared to know Best Buy's store procedures and to have a key to the register take the money.

Collins believed that this man looked like Graham and confirmed his identification with Rankin and with an employee of the Elyria store who had been working on the day of the theft. The reasonableness of Best Buy's belief is bolstered by the fact that, based on the same **[*497]** evidence Best Buy had, the police arrested Graham, a grand jury indicted him, and a prosecutor decided to pursue the case. Assuming that Graham has made a prima facie case of retaliation, he has not made a sufficient showing of pretext **[**20]** to overcome Best Buy's proffered legitimate non-discriminatory reason for reporting him to the police. Summary judgment was proper on this claim.

## D. Abuse-of-Process Claim

*HN7*[⇡] In Ohio, the tort of abuse of process has three elements: "'(1) that a legal proceeding has been set in motion in proper form and with probable cause; (2) that the proceeding has been perverted to attempt to accomplish an ulterior purpose for which it was not designed; and (3) that

direct damage has resulted from the wrongful use of process.'" *Voyticky v. Vill. of Timberlake, 412 F.3d 669, 677 (6th Cir. 2005)* (quoting *Yaklevich v. Kemp, Schaeffer & Rowe Co., 68 Ohio St. 3d 294, 1994 Ohio 503, 626 N.E.2d 115, 116 (Ohio 1994))*. An abuse-of-process claim will not survive a motion to dismiss when it is supported only by "conclusory allegations regarding the defendants' ulterior motives with no facts to support those contentions." *Hahn v. Star Bank, 190 F.3d 708, 718 (6th Cir. 1999)*. This court has also noted that "there is no liability [for abuse of process] where the defendant has done nothing more than carry out the process to its authorized conclusion, even though with bad intentions." *Id.* (internal quotation marks omitted).

Graham complains that Best **[**21]** Buy presented no "admissible evidence of its alleged 'good faith.'" Appellant Br. at 46. Graham, however, bears the burden of responding to a properly supported motion for summary judgment. *Fed. R. Civ. P. 56(e)(2)*. Best Buy presented evidence that Collins reported Graham to the police

because Collins believed that Graham had committed the theft. Graham has offered no facts in support of the proposition that Best Buy acted with an ulterior motive. Additionally, he presents no evidence that Best Buy did anything beyond "carry[ing] out the process to its authorized conclusion." *Hahn, 190 F.3d at 718*.

## E. Malicious-Prosecution Claims

*HN8*[⬆] In Ohio, the elements of the tort of malicious criminal prosecution are: "(1) malice in instituting or continuing the prosecution, (2) lack of probable cause, and (3) termination of the prosecution in favor of the accused." *Trussell v. Gen. Motors Corp., 53 Ohio St. 3d 142, 559 N.E.2d 732, 736 (Ohio 1990)*; *see also Harris v. Bornhorst, 513 F.3d 503, 520 (6th Cir. 2008)*. Malice is defined as "an improper purpose or any purpose, other than the legitimate interest of bringing an offender to justice." *Criss v. Springfield Twp., 56 Ohio St. 3d 82, 564 N.E.2d 440, 443 (Ohio 1990)*; *see also Harris, 513 F.3d at 521*. **[\*\*22]** However, "if the lack of

probable cause is demonstrated, the legal inference may be drawn that the proceedings were actuated by malice." *Thacker v. City of Columbus, 328 F.3d 244, 260-61 (6th Cir. 2003)* (internal quotation marks omitted). Probable cause for this purpose is defined as "'a reasonable ground of suspicion, supported by circumstances sufficiently strong in themselves to warrant a cautious [individual] in the belief that the person accused is guilty of the offense with which he [or she] is charged.'" *Harris, 513 F.3d at 520* (quoting *Rogers v. Barbera, 170 Ohio St. 241, 164 N.E.2d 162, 166 (Ohio 1960))*.

*HN9*[⬆] For purposes of an Ohio malicious-prosecution claim, "'[a]n indictment . . . is *prima facie* evidence of probable cause and a plaintiff must bring forward substantial evidence to rebut this.'" [10]

**[\*498]** *Harris v. United States, 422 F.3d*

---

[10] Graham cites cases dealing with *Fourth Amendment* claims of unlawful seizure which note that in that context there has been no holding that "a *subsequent* grand jury indictment can establish probable cause for an earlier arrest." Appellant Br. at 48; *Radvansky v. City of Olmsted Falls, 395 F.3d 291, 307 n.13 (6th Cir. 2005)*. These case are distinguishable because they apply to a constitutional claim brought **[\*\*24]** against law-enforcement officers rather than to a tort claim brought against private actors.

*322, 327 (6th Cir. 2005)* (quoting *Carlton v. Davisson, 104 Ohio App. 3d 636, 662 N.E.2d 1112, 1121 (Ohio Ct. App. 1995))*. A plaintiff can rebut an indictment by showing that "'the return of the indictment resulted from perjured testimony or that the grand jury proceedings were otherwise significantly irregular.'" *Id.* (quoting *Deoma v. Shaker Heights, 68 Ohio App. 3d 72, 587 N.E.2d 425, 428 (Ohio Ct. App. 1990))*. **[**23]** Graham has presented no evidence to rebut the presumption that his indictment demonstrates probable cause. He argues that Best Buy's investigation was flawed and that this was the only evidence presented in the grand jury, but he does not allege perjury or significant irregularities in the grand jury. In addition to the indictment, the prosecutor assigned to Graham's case stated that he only pursues cases where he feels he can "sustain a conviction beyond a reasonable doubt," a higher standard than probable cause, and that once he felt that standard was not met in Graham's case, he dismissed the charges. J.A. at 414-15 (Gauthier Dep. at 40-43). Because Graham cannot establish

that he was prosecuted without probable cause, Graham cannot prevail on his malicious-prosecution claims.

## F. Defamation Claim

Graham alleges that Best Buy defamed him when it identified him to the police as the perpetrator of the alleged theft. **HN10**[↑] In Ohio, the elements of defamation are: "(a) a false and defamatory statement concerning another; (b) an unprivileged publication to a third party; (c) fault amounting at least to negligence on the part of the publisher; and (d) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication." *Harris v. Bornhorst, 513 F.3d at 522* (internal quotation marks omitted). Assuming that Graham has established each of these elements, summary judgment is proper because Graham cannot overcome Best Buy's qualified privilege.

**HN11**[↑] Ohio law provides qualified

privilege [11] for disclosures when:

circumstances exist, or are reasonably believed by the defendant to exist, which cast on him the duty of making a communication to a certain other person to whom he makes such communication in the performance of such duty, or [where] the person is so situated that it becomes right in the interests of society that he should tell [**25] third persons certain facts, which he in good faith proceeds to do.

*A & B-Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council, 73 Ohio St. 3d 1, 1995 Ohio 66, 651 N.E.2d 1283, 1290 (Ohio 1995)*; see also *Parry v. Mohawk Motors of Mich., Inc., 236 F.3d 299, 313 (6th Cir. 2000)*. HN12[↑] The Ohio Supreme Court held that qualified privilege shields individuals who report information about public-work contracts to government officials. *A & B-Abell Elevator, 651 N.E.2d*

*at 1291*. It is in society's interest that people reporting crimes to the police be similarly protected. Best Buy disclosed Graham's name to the police so that investigation could be conducted, and Best Buy is entitled **[*499]** to qualified privilege. See *id. at 1291-92*.

To overcome qualified privilege, Graham must show that Best Buy acted with actual malice, or "knowledge that the statements are false or acting with reckless disregard as to their truth or falsity." **[**26]** *Id. at 1292* (internal quotation marks omitted). Graham offers nothing to show actual malice. Best Buy's investigation may not have been perfect, but Graham presents no question of material fact suggesting that Best Buy reported him with actual malice. Accordingly, summary judgment on his defamation claim is proper.

## G. Claim of Intentional Infliction of Emotional Distress

HN13[↑] To survive summary judgment on his claim of intentional infliction of emotional distress, Graham must show

---

[11] The district court held that Best Buy was entitled to absolute privilege for its disclosures, but on appeal Best Buy argues that it had qualified privilege. Also, Graham cannot defeat a claim of qualified privilege, so the intricacies of which type of privilege applies here need not be explored.

that: "(1) [Best Buy] intended to cause emotional distress, or knew or should have known that their actions would result in [Graham's] serious emotional distress, (2) [Best Buy's] conduct was extreme and outrageous, (3) [Best Buy's] actions proximately caused [Graham's] emotional injury, and (4) [Graham] suffered serious emotional anguish." *Miller v. Currie, 50 F.3d 373, 377 (6th Cir. 1995).* The Ohio Supreme Court adopted the language from the *Restatement of the Law 2d, Torts* (1965) which states that **HN14**[⬆] the defendant must act with more than criminal intent, and that to be liable for this tort, the defendant's conduct must have been "so outrageous in character, and so extreme in degree, as to go beyond all possible **[**27]** bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Yeager v. Local Union 20, Teamsters of America, 6 Ohio St. 3d 369, 6 Ohio B. 421, 453 N.E.2d 666, 671 (Ohio 1983)* (internal quotation marks omitted), *abrogated on other grounds by Welling v. Weinfeld, 113 Ohio St. 3d 464, 2007 Ohio 2451, 866 N.E.2d 1051 (Ohio 2007).*

The differences between the case Graham cites to support his assertion that Best Buy's conduct was "outrageous" and his own highlight the fact that Graham has not made a sufficient showing to prevail on this claim. In *Russ v. TRW, Inc., 59 Ohio St. 3d 42, 570 N.E.2d 1076, 1082 (Ohio 1991),* the Ohio Supreme Court found a jury determination of outrageous conduct warranted where an employer ordered an employee to perform certain acts, led him to believe these acts were legal, then fired him in a way meant to suggest that he was responsible for these acts, and sought to make him the target of a federal investigation into these acts. Graham relies on allegations of conduct that do not approach this level of bad faith. Graham has also failed to allege sufficient facts to allow a jury to find that he suffered severe emotional distress or damage. Summary judgment on Graham's claim of intentional infliction of emotional **[**28]** distress is proper.

298 Fed. Appx. 487, *499L; 2008 U.S. App. LEXIS 22224, **28

## III. CONCLUSION

For the reasons discussed above, we **AFFIRM** the district court's judgment.

---

**End of Document**



## *Garcia v. Thorne*

United States Court of Appeals for the Sixth Circuit

March 19, 2013, Filed

File Name: 13a0275n.06

No. 12-1774

### Reporter

520 Fed. Appx. 304 *; 2013 U.S. App. LEXIS 5800 **; 2013 FED App. 0275N (6th Cir.); 2013 WL 1136552

GUADALUPE LINDA GARCIA, Plaintiff-Appellant, v. MATTHEW THORNE, Defendant-Appellee.

**Notice:** NOT RECOMMENDED FOR FULL-TEXT PUBLICATION. *SIXTH CIRCUIT RULE 28* LIMITS CITATION TO SPECIFIC SITUATIONS. PLEASE SEE *RULE 28* BEFORE CITING IN A PROCEEDING IN A COURT IN THE SIXTH CIRCUIT. IF CITED, A COPY MUST BE SERVED ON OTHER PARTIES AND THE COURT. THIS NOTICE IS TO BE PROMINENTLY DISPLAYED IF THIS DECISION IS REPRODUCED.

**Prior History: [**1]** ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MICHIGAN.

*Garcia v. Thorne, 2012 U.S. Dist. LEXIS 69812 (W.D. Mich., May 18, 2012)*

### Core Terms

arrest, probable cause, retaliation, felony, harboring, phone call, shock, summary judgment, conscience, felon, phone, lack probable cause, abuse of process, criminal charge, false statement, arrest warrant, district court, allegations, malicious, argues, rights

### Case Summary

#### Procedural Posture

Plaintiff sued a police officer alleging false arrest, violation of her substantive due

process rights, malicious prosecution, retaliation, and abuse of process. The officer moved for summary judgment on all claims, and the United States District Court for the Western District of Michigan granted his motion. Plaintiff appealed.

## Overview

Plaintiff claimed, on false arrest and malicious prosecution theories, that the officer violated her *Fourth Amendment* right to be free from an unlawful seizure. Affirming, the court pointed out that to state a claim of false arrest, a plaintiff had to show that the arresting officer lacked probable cause to arrest her. The officer had probable cause to believe that plaintiff had committed the crime of harboring a felon, her 15-year-old son. The family court's issuance of the warrant for the son's arrest was not a clear indication that he would not be charged as an adult. Pursuant to *Mich. Comp. Laws § 712A.4(1)*, family court judges could waive jurisdiction in cases involving juveniles age 14 and older who committed crimes that would be a felony if committed by an adult.

The court ruled that summary judgment was appropriate given that the court had already determined that the officer had probable cause for seeking plaintiff's arrest and that his challenged behavior was part of an established pattern of behavior in which the officer engaged prior to plaintiff's protected action.

## Outcome

The court affirmed the judgment.

## LexisNexis® Headnotes

Civil Procedure > Appeals > Standards of Review > De Novo Review

Civil Procedure > ... > Summary Judgment > Appellate Review > Standards of Review

Civil Procedure > Judgments > Summary Judgment > Evidentiary Considerations

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > General Overview

520 Fed. Appx. 304, *304; 2013 U.S. App. LEXIS 5800, **1

**HN1**[⬇] **Standards of Review, De Novo Review**

The United States Court of Appeals for the Sixth Circuit reviews a district court's grant of summary judgment de novo. Summary judgment is proper if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(a)*. In deciding a motion for summary judgment, the court must view the factual evidence and draw all reasonable inferences in favor of the nonmoving party. While all inferences are drawn in favor of the non-moving party, that party still must present some affirmative evidence supporting its position to defeat an otherwise appropriate motion for summary judgment.

    Evidence > Burdens of Proof > Allocation

    Torts > Intentional Torts > False Arrest > Elements

**HN2**[⬇] **Burdens of Proof, Allocation**

To state a claim of false arrest, a plaintiff must show that the arresting officer lacked probable cause to arrest her.

    Evidence > Burdens of Proof > Allocation

    Torts > ... > Elements > Lack of Probable Cause > General Overview

**HN3**[⬇] **Burdens of Proof, Allocation**

To state a claim for malicious prosecution, a plaintiff must show that the arresting officer lacked probable cause to seek the initiation of criminal proceedings against her.

    Criminal Law & Procedure > Commencement of Criminal Proceedings > Arrests > Probable Cause

**HN4**[⬇] **Arrests, Probable Cause**

An arresting officer's actual motives are irrelevant to the probable cause analysis.

Criminal Law & Procedure > Juvenile Offenders > Trial as Adult > Discretionary Waiver

Criminal Law & Procedure > Criminal Offenses > Classification of Offenses > Felonies

Criminal Law & Procedure > ... > Crimes Against Persons > Home Invasion > General Overview

Criminal Law & Procedure > Juvenile Offenders > General Overview

Criminal Law & Procedure > Juvenile Offenders > Juvenile Proceedings > Jurisdiction

### *HN5*[⬇] Trial as Adult, Discretionary Waiver

Although it is true that the family division of the Michigan Circuit Court has exclusive jurisdiction in dealing with juveniles, *Mich. Comp. Laws § 712A.2*, judges may waive this jurisdiction in cases involving juveniles age 14 and older who commit crimes that would be a felony if committed by an adult.

*Mich. Comp. Laws § 712A.4(1)*. Second-degree home invasion is a felony for adults.

Criminal Law & Procedure > ... > Search Warrants > Affirmations & Oaths > Sufficiency Challenges

Evidence > Burdens of Proof > Allocation

Evidence > Burdens of Proof > Preponderance of Evidence

### *HN6*[⬇] Affirmations & Oaths, Sufficiency Challenges

With regard to a false statement in the warrant affidavit claim, a plaintiff must prove by a preponderance of the evidence that, in order to procure the warrant, the officer knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that created a falsehood and such statements or omissions were material, or necessary, to the finding of probable cause.

Criminal Law & Procedure > Criminal Offenses > Classification of Offenses > Felonies

Criminal Law & Procedure > Criminal Offenses > Obstruction of Administration of Justice > General Overview

## *HN7*[⤓] Classification of Offenses, Felonies

*Mich. Comp. Laws § 750.199(3)* explains that a person who knowingly or willfully conceals or harbors for the purpose of concealment from a peace officer someone who is subject to an arrest warrant or bench warrant for a felony is guilty of a felony.

Civil Rights Law > Protection of Rights > Immunity From Liability > Defenses

Criminal Law & Procedure > Commencement of Criminal Proceedings > Arrests > Probable Cause

## *HN8*[⤓] Immunity From Liability, Defenses

Police officers are entitled qualified immunity unless there is such an utter lack in probable cause for an arrest that no officer of reasonable competence would have concluded that a warrant should issue. In other words, if the court finds that an officer lacked probable cause, the court turns to the question of whether the officer made a reasonable mistake of law.

Constitutional Law > Substantive Due Process > Scope

Evidence > Burdens of Proof > Allocation

## *HN9*[⤓] Constitutional Law, Substantive Due Process

The *Fourteenth Amendment's Due Process Clause* has a substantive component that guarantees protection of the individual against arbitrary action of government. A civil rights plaintiff must show that an officer's conduct was so arbitrary as to shock the conscience.

Constitutional Law > ... > Fundamental Freedoms > Freedom of Speech > General Overview

Evidence > Burdens of Proof > Allocation

### HN10[⬇] Fundamental Freedoms, Freedom of Speech

To establish a retaliation claim under the *First Amendment*, a civil rights plaintiff must show that: (1) she was engaged in constitutionally protected activity; (2) a defendant's adverse action caused her to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that activity; and (3) the adverse action was motivated at least in part as a response to the exercise of her constitutional rights.

Civil Procedure > ... > Summary Judgment > Burdens of Proof > Movant Persuasion & Proof

Constitutional Law > ... > Fundamental Freedoms > Freedom of

Speech > General Overview

Civil Procedure > ... > Summary Judgment > Burdens of Proof > Nonmovant Persuasion & Proof

### HN11[⬇] Burdens of Proof, Movant Persuasion & Proof

If a defendant can show that he would have taken the same action in the absence of a protected activity, he is entitled to prevail on summary judgment. The plaintiff must point to specific, nonconclusory evidence reasonably linking her speech to the adverse action. Temporal proximity, standing alone, is insufficient to establish a causal connection for a *First Amendment* retaliation claim.

Criminal Law & Procedure > Commencement of Criminal Proceedings > Arrests > Probable Cause

### HN12[⬇] Arrests, Probable Cause

The lack of probable cause for an arrest

warrant is highly probative, if not dispositive, of the existence of a retaliatory motive. Along those same lines, it is arguable that the existence of probable cause indicates a lack of retaliatory motive.

Civil

Procedure > Judgments > Summary Judgment > Evidentiary Considerations

**HN13**[🔽] **Summary Judgment, Evidentiary Considerations**

Summary judgment is generally not well suited for cases in which motive and intent are at issue and in which the alleged wrongdoers are in control of the proof.

Civil Rights Law > Protection of Rights > Section 1983 Actions > Scope

Torts > Intentional Torts > Abuse of Process > General Overview

**HN14**[🔽] **Protection of Rights, Section 1983 Actions**

The United States Court of Appeals for the Sixth Circuit has not specifically determined whether a claim for abuse of process is a cognizable constitutional claim that can be redressed pursuant to *42 U.S.C.S. § 1983*. Still, the court has resolved *§ 1983* abuse-of-process claims without deciding whether such a claim is cognizable and, in doing so, the court typically assumes that the elements would likely mirror those of state law.

Evidence > Burdens of Proof > Allocation

Torts > Intentional Torts > Abuse of Process > Elements

**HN15**[🔽] **Burdens of Proof, Allocation**

In Michigan, to establish a claim for abuse of process, a plaintiff must prove: (1) an ulterior purpose and (2) an act in the use of process which is improper in the regular prosecution of the proceeding. For an abuse-of-process claim, the misconduct is not the wrongful procurement of legal process or the wrongful initiation of criminal or civil proceedings; it is the misuse of process, no matter how properly obtained,

for any purpose other than that which it was designed to accomplish.

**Counsel:** For GUADALUPE LINDA GARCIA, Plaintiff - Appellant: J. Nicholas Bostic, Law Office, Lansing, MI.

For MATTHEW THORNE, Defendant - Appellee: Shaina R. Reed, Jason David Kolkema, Johnson, Rosati, Schultz & Joppich, Lansing, MI.

**Judges:** Before: MARTIN and GILMAN, Circuit Judges; and FOWLKES, District Judge.[*]

**Opinion by:** BOYCE F. MARTIN, JR.

## Opinion

[*305] **BOYCE F. MARTIN, JR., Circuit Judge.** Guadalupe Linda Garcia sued Officer Matthew Thorne of the Mason Police Department, alleging false arrest, violation of her substantive due process rights, malicious prosecution, retaliation, and abuse of process. Thorne moved for summary judgment on all claims, and the

district court granted his motion. For the reasons that follow, we **AFFIRM** the judgement of the district court.

I.

On March 17, 2008, the Mason Police Department responded to a breaking and entering at a home in Mason, Michigan. During the course of the investigation, Garcia's fifteen-year-old son, Chaz Smith, became a suspect. On March 24, 2008, Officer Thorne requested **[**2]** a warrant from the Ingham County Prosecutor's Office. In the warrant request, Thorne cited Chaz for second-degree home invasion, and he noted that the crime is a felony. On March 27, 2008, Assistant Prosecuting Attorney Patricia Esch authorized the warrant, and because Chaz was a juvenile, the state court's family division issued an apprehension order. In the authorization section of the warrant request, Esch cited Chaz for second-degree home invasion and also indicated that the crime is a felony.

Thorne called Garcia's mobile and home phones several times in an attempt to

[*] The Honorable John T. Fowlkes, United States District Judge for the Western District of Tennessee, sitting by designation.

apprehend Chaz. According to Garcia, Thorne made calls at inappropriate hours. In her complaint, she claims that Thorne called her home telephone on April 1, 2008 at approximately 3:00 a.m., and that she told Thorne to leave her son alone. Garcia also claims that Thorne called her home and mobile phones on April 10, 2008 between 1:00 a.m. and 4:00 a.m. According to Thorne, Garcia refused to give Thorne her current address. Apparently, neither Thorne nor anyone in the Mason Police Department knew Garcia's address, but at **[*306]** some point Thorne obtained information that she had moved from Mason to the south side of Lansing, **[**3]** Michigan.

Thorne had at least one interaction with Garcia prior to his attempts to arrest Chaz. Around 2005, Garcia had a domestic dispute with her then boyfriend and former Lansing Police Officer Rob Vargas. According to Garcia, Vargas broke into her home and assaulted and raped her. She called the Mason Police Department to report the incident and Thorne arrived at the scene. Garcia felt as if Thorne did not

take her complaint seriously and that he blamed her for the dispute. According to Garcia, Thorne told her that she should leave Vargas alone. In Thorne's 2008 Incident Report concerning his attempts to apprehend Chaz, he noted that "[i]t is known through many contacts with [Garcia] that she is very anti-police."

On April 3, 2008, Garcia visited Matt Stuard, the Program Coordinator at Chaz's school, Mason Summit High School, in order to talk about Chaz's absence from school. Stuard sent an email to the school's Resource Officer, Steve Chick, explaining what took place during the meeting with Garcia. According to Stuard's email, Garcia explained that Chaz was having "legal problems" and that there was a warrant for his arrest. Garcia also told Stuard that she did not see the point **[**4]** of having Chaz return to the school in light of the fact that "he was going to be taken in anytime."

On April 10, 2008, Thorne spoke to Chaz over the telephone and informed him that an apprehension order had been issue for

his arrest. According to Thorne, Chaz agreed to turn himself in on April 14, 2008. On April 14, 2008, when Thorne arrived at work, Department secretary Jan Lifsey told him that Garcia had contacted the Department stating that Chaz would not be turning himself in and complaining that Thorne had been calling her in the early morning hours. Later that day, Thorne contacted Stuard, who told Thorne that Chaz had not been in school since March 31, 2008 and that Garcia said that she knew the Department wanted to arrest Chaz. According to Garcia, sometime between 1:00 and 4:00 am on April 15, 2008, Thorne called her and threatened her with criminal charges.

On April 15, 2008, Thorne submitted a warrant request for Garcia to the Prosecutor's Office, citing her for harboring a felon. The warrant request listed the location of the crime as the City of Mason and listed Garcia's address as being in Mason. On April 16, 2008, instead of authorizing a warrant for harboring a fugitive, **[\*\*5]** the Prosecutor's Office authorized a warrant for misdemeanor

truancy. According to Thorne's Incident Report, he obtained Garcia's Lansing, Michigan address on April 16, 2008. The Lansing Police Department executed the warrant the same day and transferred Garcia into Thorne's custody. The police arrested Chaz on April 17, 2008. Garcia was in county jail for less than a full day, and a little over a month after her arrest, the prosecutor filed a *nolle prosequi* and dismissed the truancy charges. Garcia filed the instant suit on April 10, 2011.

Garcia brought six claims against Thorne under *42 U.S.C. § 1983*: (1) false arrest; (2) violation of her substantive due process rights; (3) malicious prosecution; (4) retaliation; (5) abuse of process; and (6) exemplary damages. Thorne moved for summary judgment, and the district court granted the motion as to all claims and noted that Garcia improperly brought exemplary damages as a claim. Garcia appeals the district court judgment.

II.

**HN1**[⇡] We review a district court's grant of summary judgment de novo. *Binay v.*

[*307] Bettendorf, 601 F.3d 640, 646 (6th Cir. 2010) (citation omitted). Summary judgment is proper "if the movant shows that there is no genuine dispute [**6] as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In deciding a motion for summary judgment, the court must view the factual evidence and draw all reasonable inferences in favor of the nonmoving party." Banks v. Wolfe Cnty. Bd. of Educ., 330 F.3d 888, 892 (6th Cir. 2003) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)). "While all inferences are drawn in favor of the non-moving party, that party still must present some affirmative evidence supporting its position to defeat an otherwise appropriate motion for summary judgment." Tucker v. Tennessee, 539 F.3d 526, 531 (6th Cir. 2008) (citations omitted).

III.

Garcia claims, on false arrest and malicious prosecution theories, that Thorne violated her Fourth Amendment right to be free from an unlawful seizure. HN2[↑] To state a claim of false arrest, a plaintiff must show that the arresting officer lacked probable cause to arrest her. Sykes v. Anderson, 625 F.3d 294, 305 (6th Cir. 2010) (citing Voyticky v. Village of Timberlake, Ohio, 412 F.3d 669, 677 (6th Cir. 2005)). We are willing to assume that Garcia may bring this claim against Thorne in spite of [**7] the fact that Thorne was not the arresting officer and that the Prosecutor's Office authorized a warrant for Garcia's arrest based a truancy charge, which is not the charge upon which Thorne sought to have Garcia arrested. HN3[↑] To state a claim for malicious prosecution, a plaintiff must show that the arresting officer lacked probable cause to seek the initiation of criminal proceedings against her. Id. at 310-11 (citing Fox v. DeSoto, 489 F.3d 227, 237 (6th Cir. 2007)). We are willing to assume that Garcia may bring this claim against Thorne because it is likely that, as the investigating officer, Thorne influenced the decision to prosecute Garcia. Id. at 311.

Garcia argues that there could not have

been probable cause to arrest her or to initiate criminal proceedings against her for the crime of harboring a felon because Thorne knew or should have known that because Chaz was a minor, he would not be charged as an adult and therefore would not be charged with a felony. Garcia does not dispute that she was indeed harboring Chaz. In order to make a finding of probable cause, we consider the totality of the circumstances and whether the facts and circumstances of which Thorne had knowledge **[\*\*8]** at the time of the arrest were sufficient to warrant a prudent person in believing that Garcia had committed an offense. *Id. at 306* (citation omitted). **HN4**[↑] The arresting officer's actual motives are irrelevant to the probable cause analysis. *Criss v. City of Kent, 867 F.2d 259, 262 (6th Cir. 1988)* (citing *Scott v. United States, 436 U.S. 128, 138, 98 S. Ct. 1717, 56 L. Ed. 2d 168 (1978))*.

Thorne had probable cause to believe that Garcia had committed the crime of harboring a felon. Garcia argues that the family court's issuance of the warrant for Chaz's arrest is a clear indication that Chaz

would not be charged as an adult. **HN5**[↑] Although it is true that the family division of the Michigan Circuit Court has exclusive jurisdiction in dealing with juveniles, *Mich. Comp. Laws § 712A.2*, judges may waive this jurisdiction in cases involving juveniles age 14 and older who commit crimes that would be a felony if committed by an adult. *Mich. Comp. Laws § 712A.4(1)*; *see also People v. Hana, 443 Mich. 202, 504 N.W.2d 166, 168-69 (Mich. 1993)*. Chaz's crime, second-degree home invasion, **[\*308]** is a felony for adults and he was 15 years old at the time. Additionally, in authorizing Thorne's warrant request for Chaz, Assistant Prosecutor Esch indicated that Chaz's **[\*\*9]** crime was a felony. Thorne's knowledge at the time of Garcia's arrest was sufficient to warrant a prudent person in believing that Garcia had committed the crime of harboring a felon.

Next, Garcia argues that Thorne lacked probable cause because he made material false statements in the warrant request when he stated that the crime, harboring a felon, took place in Mason and that Garcia's last known address was a Mason

address. *HN6*[⬆] With regard to the false-statement claim, Garcia must prove by a preponderance of the evidence that, in order to procure the warrant, Thorne "'knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create[d] a falsehood' and 'such statements or omissions [we]re material, or necessary, to the finding of probable cause.'" *Sykes, 625 F.3d at 305* (quoting *Wilson v. Russo, 212 F.3d 781, 786-87 (3d Cir. 2000)* (citation omitted)). Thorne obtained Garcia's Lansing address on April 16, 2008, but he testified that he knew Garcia moved to Lansing prior to that date. Garcia alleges that Thorne obtained her Lansing address on April 10, 2008. Viewing the facts in the light most favorable to Garcia, the Court will assume **[**10]** that Thorne knew that Garcia lived in Lansing at the time that he submitted the warrant request, and that he knowingly and deliberately made false statements when he alleged that Garcia's last known address was a Mason address and that Mason was the location of the crime.

Even though Thorne knowingly and deliberately lied about Garcia's address and the location of the crime, his statements were not material to a finding of probable cause. *HN7*[⬆] *Section 750.199(3) of the Michigan Compiled Laws* explains that "a person who knowingly or willfully conceals or harbors for the purpose of concealment from a peace officer" someone who is subject to an arrest warrant or bench warrant for a felony is guilty of a felony. *Mich. Comp. Laws § 750.199(3)*. Statements regarding Garcia's knowing or willful concealment of Chaz or about Chaz's arrest warrant for a felony would be material to a finding of probable cause for the crime of harboring a felon. Garcia does not allege that Thorne made false statements concerning Garcia's knowing or willful concealment of Chaz or about Chaz's arrest warrant for a felony in the warrant request. Thorne's false statements about the location of the crime and Garcia's address **[**11]** are, at most, material to a finding of the Mason Police Department's jurisdiction over the matter. It is not material to a finding of probable

cause that Garcia was committing the crime of harboring a felon.

Even if this Court were to find that Thorne lacked probable cause in seeking Garcia's arrest, Thorne is entitled to qualified immunity. *HN8*[↑] Police officers are entitled qualified immunity unless there is such an utter lack in probable cause that no officer of reasonable competence would have concluded that a warrant should issue. *Hutsell v. Sayre, 5 F.3d 996, 1003 (6th Cir. 1993)* (citing *Malley v. Briggs, 475 U.S. 335, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986)*; *Yancey v. Carroll Cnty., 876 F.2d 1238, 1243 (6th Cir. 1989))*. In other words, if we find that Thorne lacked probable cause, we turn to the question of whether Thorne made a reasonable mistake of law. If Thorne made a mistake of law, it was a reasonable mistake given that, at the time he submitted the warrant request, he knew that: (1) Garcia admitted to both the Mason Police Department and an official at Chaz's school that she was aware that **[*309]** there was a warrant for Chaz's arrest; (2) Garcia told the Mason Police Department that she advised her

son not to turn **[**12]** himself in; and (3) the warrant for Chaz was for a felony crime.

IV.

Garcia claims that Thorne violated her *Fourteenth Amendment* substantive due process rights by: (1) repeatedly calling Garcia's mobile and home phones during unreasonable hours after being told to stop and even after Garcia complained to the Mason Police Department; (2) intentionally submitting a warrant request for an alleged offense outside of his jurisdiction; and (3) intentionally submitting a warrant request for an offense for which probable cause did not exist. *HN9*[↑] The *Fourteenth Amendment's Due Process Clause* has a substantive component that guarantees "'protection of the individual against arbitrary action of government.'" *Jones v. Byrnes, 585 F.3d 971, 976 (6th Cir. 2009)* (quoting *Wolff v. McDonnell, 418 U.S. 539, 558, 94 S. Ct. 2963, 41 L. Ed. 2d 935 (1974))*. Garcia must show that Thorne's conduct was so arbitrary as to "shock the conscious." *Id.* (citing *Cnty. of Sacramento*

v. Lewis, 523 U.S. 833, 846-47, 118 S. Ct. 1708, 140 L. Ed. 2d 1043 (1998)); *see also* Draw v. City of Lincoln Park, 491 F.3d 550, 556 (6th Cir. 2007) (stating that "police conduct must be truly extraordinary in nature to qualify as 'conscience shocking'" and conduct that showed "incredibly poor judgment" did not **[**13]** meet this standard).

Taking Garcia's allegations regarding the hour and frequency of Thorne's phone calls as true, although she has not produced any evidence substantiating the allegations and Thorne has produced phone records proving that no such calls were made using his official police mobile phone, the calls do not shock the conscience. This Court has employed a very high standard when determining whether police action shocks the conscience. For example, in Lillard v. Shelby County Board of Education, 76 F.3d 716, 725-26 (6th Cir. 1996), where public school students claimed that a teacher physically abused and sexually harassed them, we determined that the slapping of a student's face without causing physical injury, while

inappropriate, did not shock the conscience. We also held that the teacher's rubbing of a student's stomach, accompanied by a remark that could be interpreted as sexually suggestive, while wholly inappropriate, did not shock the conscience. Lillard, 76 F.3d at 726. In Mitchell v. McNeil, 487 F.3d 374, 376-77 (6th Cir. 2007), the parents of a twelve-year-old boy alleged in the complaint that city police officials violated their substantive due process rights and **[**14]** those of their child by permitting a police officer to lend his personal vehicle to an informant who subsequently hit and killed their son with the vehicle. We held that the complaint's allegations did not allege conscience-shocking conduct even though the complaint alleged a city custom of "encouraging police officers to provide automobiles to informants with known histories of drug and alcohol use." McNeil, 487 F.3d at 377. We noted that while such a policy may be "strange," it was not conscience shocking. *Id.*

Here, while making phone calls to the mother of a suspected felon between the

hours of 1:00 a.m. and 4:00 a.m. arguably shows poor judgment on the part of Thorne, such behavior does not shock the conscience. Nor does Thorne's having intentionally submitted a warrant request for an alleged offense outside of his jurisdiction shock the conscience because he did not make the arrest himself. Once he obtained Garcia's Lansing address, he allowed officers with the Lansing Police Department to arrest Garcia. Finally, Garcia's **[*310]** allegation that Thorne intentionally submitted a warrant request for an offense for which probable cause did not exist is unpersuasive because we have already **[**15]** determined that probable cause did exist.

V.

Garcia argues that Thorne violated her _First Amendment_ right to be free from retaliation for expressing her criticism of Thorne when Thorne: (1) called Garcia on April 15, 2008, between 1:00 am. and 4:00 a.m.; and (2) submitted the warrant request seeking criminal charges against Garcia. **HN10**[⬆] To establish a retaliation claim

under the _First Amendment_, Garcia must show that: (1) she was engaged in constitutionally protected activity; (2) Thorne's adverse action caused her to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that activity; and (3) the adverse action was motivated at least in part as a response to the exercise of her constitutional rights. _Bloch v. Ribar, 156 F.3d 673, 678 (6th Cir. 1998)_ (citations omitted).

Thorne argues that Garcia has not established that the phone calls made the morning of August 15, 2008 or the decision to seek criminal charges against Garcia were motivated in part by Garcia's complaint that Thorne repeatedly called her at irregular hours. **HN11**[⬆] If a defendant can show that he would have taken the same action in the absence of the protected activity, he is entitled **[**16]** to prevail on summary judgment. _Thaddeus-X v. Blatter, 175 F.3d 378, 399 (6th Cir. 1999)_. The plaintiff must point to specific, nonconclusory evidence reasonably linking her speech to the

adverse action. *Rodgers v. Banks, 344 F.3d 587, 602 (6th Cir. 2003)*. "Temporal proximity, standing alone, is insufficient to establish a causal connection for a retaliation claim." *Tuttle v. Metro. Gov't of Nashville, 474 F.3d 307, 321 (6th Cir. 2007)* (citations omitted).

Garcia contends that, in addition to the temporal proximity between her complaint and Thorne's April 15, 2008 call, Thorne's statements in his Incident Report describing her as "anti-police" and his comments to her during their interaction in 2005 create an inference of retaliation on his part. It is unclear whether Thorne's description of Garcia as anti-police was in reference to his communications with Garcia in the past or to his communications with Garcia as he attempted to apprehend Chaz. Nonetheless, Thorne describing Garcia as anti-police is not an indication that he retaliated against Garcia. Thorne's Incident Report went on to explain the ways in which Garcia was hostile to him, and Garcia admitted to having some "choice **[\*\*17]** words" for Thorne during at least one phone conversation. No one

could reasonably infer from Thorne's comments an intention or desire to retaliate against Garcia. Moreover, this Court is not willing to view Thorne's comments to Garcia during the 2005 encounter, which involved a completely unrelated event that took place approximately three years prior to Garcia's complaint, as comments creating an inference of retaliation.

Thorne's phone call on April 15, 2008 and his decision to pursue criminal charges against Garcia were not acts of retaliation. Regarding the phone call, Garcia's complaint alleges that Thorne made early morning phone calls to her on at least two occasions prior to the April 15 phone call. Even assuming that Thorne had a pattern of calling Garcia during the early morning hours, however unwise and inappropriate the phone calls might have been, such calls are not evidence that Thorne's call on April 15 was in retaliation for her informal complaint; rather, they are evidence of the **[\*311]** continuation of an already established pattern of behavior.

As to Garcia's claim that Thorne retaliated

by pursuing criminal charges and seeking an arrest warrant, the Supreme Court has held **[\*\*18]** that *HN12*[↑] the lack of probable cause is highly probative, if not dispositive, of the existence of a retaliatory motive. *Hartman v. Moore, 547 U.S. 250, 265-66, 126 S. Ct. 1695, 164 L. Ed. 2d 441 (2006)*. Along those same lines, it is arguable that the existence of probable cause indicates a lack of retaliatory motive. We have already established that Thorne had probable cause in seeking to obtain an arrest warrant for Garcia. Moreover, it is likely that Thorne sought the warrant for Garcia's arrest the day after Garcia made her complaint because, in addition to complaining about Thorne's phone calls, Garcia also revealed that she did not intend to allow Chaz to turn himself in. Although *HN13*[↑] summary judgment is generally not well suited for cases in which motive and intent are at issue and in which the alleged wrongdoers are in control of the proof, *Perry v. McGinnis, 209 F.3d 597, 600-01 (6th Cir. 2000)* (citing *Cooper v. North Olmsted, 795 F.2d 1265, 1272 (6th Cir. 1986))*, this is a case where summary

judgment is appropriate given that we have already determined that Thorne had probable cause for seeking Garcia's arrest and that Thorne's challenged behavior is part of an established pattern of behavior in which Thorne engaged **[\*\*19]** prior to Garcia's protected action.

VI.

Finally, Garcia accuses Thorne of abuse of process. *HN14*[↑] The Sixth Circuit has not "specifically determined whether a claim for abuse of process is a cognizable constitutional claim that can be redressed pursuant to *§ 1983*." *Voyticky, 412 F.3d at 676*. Still, we have resolved *section 1983* abuse-of-process claims without deciding whether such a claim is cognizable and, in doing so, we typically assume that the elements would likely mirror those of state law. *Id. at 676-77*.

*HN15*[↑] In Michigan, to establish a claim for abuse of process, a plaintiff must prove: "(1) an ulterior purpose and (2) an act in the use of process which is improper in the regular prosecution of the proceeding." *Friedman v. Dozorc, 412 Mich. 1, 312*

*N.W.2d 585, 594 (Mich. 1981)* (citation omitted). For an abuse-of-process claim, the misconduct "is not the wrongful procurement of legal process or the wrongful initiation of criminal or civil proceedings; it is the misuse of process, no matter how properly obtained, for any purpose other than that which it was designed to accomplish." *Id. at n.18* (quoting *Restatement (Second) of Torts § 682 cmt. a* (1977)). Garcia's abuse-of-process claim against Thorne fails **[**20]** because Thorne's behavior has to do with the initiation of criminal proceedings, not the misuse of process. *Spear v. Pendill, 164 Mich. 620, 130 N.W. 343, 344 (Mich. 1911)* (stating that the abuse-of-process cause of action "lies for the improper use of process after it has been issued, not for maliciously causing it to issue").

For the aforementioned reasons, the judgment of the district court is **AFFIRMED.**



## *Jerome v. Crum*

United States Court of Appeals for the Sixth Circuit

August 17, 2017, Filed

File Name: 17a0480n.06

No. 16-2281

### Reporter

695 Fed. Appx. 935 *; 2017 U.S. App. LEXIS 15774 **; 2017 FED App. 0480N (6th Cir.); 2017 WL 3530887

SAMUEL M. JEROME, Plaintiff-Appellant, v. LIEUTENANT MICHAEL CRUM; CITY OF BERKELY, Defendants-Appellees.

**Notice:** NOT RECOMMENDED FOR FULL-TEXT PUBLICATION. *SIXTH CIRCUIT RULE 28* LIMITS CITATION TO SPECIFIC SITUATIONS. PLEASE SEE *RULE 28* BEFORE CITING IN A PROCEEDING IN A COURT IN THE SIXTH CIRCUIT. IF CITED, A COPY MUST BE SERVED ON OTHER PARTIES AND THE COURT. THIS NOTICE IS TO BE PROMINENTLY DISPLAYED IF THIS DECISION IS REPRODUCED.

**Prior History: [**1]** ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN.

*Jerome v. Crum, 2016 U.S. Dist. LEXIS 113497 ( E.D. Mich., Aug. 25, 2016)*

### Core Terms

interview, probable cause, arrest, rubbed, recordings, stomach, clothing, touched, sexual, vagina, preliminary examination, district court, malicious, assault, existence of probable cause, grant of summary judgment, police station

### Case Summary

#### Overview

HOLDINGS: [1]-The arrestee could not have met the required elements of a false-

arrest and false-imprisonment claim because he could not have demonstrated that there was no probable cause when his arrest warrant was issued because, inasmuch as the alleged victim persisted in her accusations that the arrestee twice assaulted her to the extent of testifying under oath in trial and at the preliminary examination, the alleged inconsistencies could not have reasonably been deemed to compel the conclusion that probable cause had ceased to exist; [2]-The arrestee could not have shown the lack of probable cause required for a malicious prosecution claim under the *Fourth Amendment* because probable cause existed for the arrestee's arrest, and the withholding of the information within an interview was not material to the prosecution.

**Outcome**

Judgment affirmed.

## LexisNexis® Headnotes

Civil Procedure > Appeals > Standards

of Review > De Novo Review

Civil Procedure > ... > Summary Judgment > Appellate Review > Standards of Review

### *HN1*[⬇] Standards of Review, De Novo Review

An appellate court reviews a grant of summary judgment de novo. In its review, the appellate court views factual evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.

Civil Procedure > Judgments > Summary Judgment > Entitlement as Matter of Law

### *HN2*[⬇] Summary Judgment, Entitlement as Matter of Law

Summary judgment is proper where the movant can show there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(a)*.

Civil Rights Law > ... > Scope > Law Enforcement Officials > Arrests

Torts > Intentional Torts > False Arrest > Elements

Criminal Law & Procedure > Commencement of Criminal Proceedings > Arrests > Probable Cause

Evidence > Burdens of Proof > Preponderance of Evidence

Criminal Law & Procedure > Commencement of Criminal Proceedings > Arrests > Warrants

## *HN3*[⬇] **Law Enforcement Officials, Arrests**

A false arrest claim under federal law requires a plaintiff to prove that the arresting officer lacked probable cause to arrest the plaintiff. Where a facially valid warrant was issued, a plaintiff must prove by a preponderance of the evidence that in order to procure the warrant, the defendant knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that created a falsehood and such statements or omissions were material, or necessary, to the finding of probable cause. Probable cause has been defined as knowledge sufficient to warrant a prudent person's belief that a particular individual had committed an offense. To determine whether probable cause existed, a court normally examines the totality of the circumstances, including all inculpatory and exculpatory evidence.

Criminal Law & Procedure > Commencement of Criminal Proceedings > Arrests > Probable Cause

## *HN4*[⬇] **Arrests, Probable Cause**

In the usual case, a victim's accusation that she had been sexually assaulted, standing alone, can be sufficient to establish probable cause for an arrest. But the presumption of veracity applies only where

the witness is someone with respect to whom there is no apparent reason to question the person's reliability. Inconsistent descriptions of events are a factor weighing in favor of unreliability.

Constitutional Law > ... > Fundamental Rights > Search & Seizure > Scope of Protection

Torts > Intentional Torts > Malicious Prosecution > Civil Rights Actions

Torts > Intentional Torts > Malicious Prosecution > Elements

*HN5*[ ] **Search & Seizure, Scope of Protection**

In Sykes v. Anderson, the U.S. Court of Appeals for the Sixth Circuit set out the elements of a malicious-prosecution claim under the *Fourth Amendment*. Those elements are (1) that a criminal prosecution was initiated against the plaintiff and that the defendant made, influenced, or participated in the decision to prosecute; (2) that there was a lack of probable cause for the criminal prosecution; (3) that, as a consequence of a legal proceeding, the plaintiff suffered a deprivation of liberty apart from the initial seizure; and (4) the criminal proceeding must have been resolved in the plaintiff's favor. The crux of the case is whether there was a lack of probable cause for the prosecution. Where there is an indictment (or an independent probable-cause determination by a judge), that usually conclusively determines the existence of probable cause. But in King v. Harwood, the Sixth Circuit held that malicious pre-indictment nontestimonial acts by police that were material to the prosecution of a plaintiff could rebut the presumptive probable cause established by a grand-jury indictment.

Constitutional Law > ... > Fundamental Rights > Procedural Due Process > Scope of Protection

Criminal Law & Procedure > ... > Discovery & Inspection > Brady Materials > Brady Claims

**HN6**[⬇] **Procedural Due Process, Scope of Protection**

The test for claims of denial of due process through the withholding of evidence is derived from Brady v. Maryland. As explained by the U.S. Supreme Court, a due-process violation results where the State suppresses evidence favorable to a defendant, material to either his guilt or punishment, and of a nature that would have had a reasonable probability of changing the result of the proceeding. The U.S. Court of Appeals for the Sixth Circuit has extended that obligation from prosecutors to police officers. But the Sixth Circuit has held that where the underlying criminal proceeding terminated in a defendant's favor, he has not been injured by the act of wrongful suppression of exculpatory evidence.

Civil Rights Law > ... > Immunity From Liability > Local Officials > Customs & Policies

**HN7**[⬇] **Local Officials, Customs & Policies**

Municipal liability is predicated on the existence of a constitutional violation.

**Counsel:** For SAMUEL M. JEROME, Plaintiff - Appellant: Christopher Patrick Desmond, Law Offices, Detroit, MI.

For LIEUTENANT MICHAEL CRUM, CITY OF BERKELY, Defendants - Appellees: Mary Massaron, Hilary Ann Ballentine, Plunkett Cooney, Bloomfield Hills, MI; Laurel F. McGiffert, Law Offices, Detroit, MI.

**Judges:** BEFORE: BOGGS, CLAY, and SUTTON, Circuit Judges.

**Opinion by:** BOGGS

## Opinion

 [*936] BOGGS, Circuit Judge. An inconsistent recollection of an event is frequently taken as an indication of falsehood. Truth is, life is seldom that straightforward. In this case, Samuel Jerome seeks to establish that the variations in the story of his step-daughter regarding alleged sexual abuse meant that there was no probable cause to arrest him

and that an alleged cover-up of those variations by Lieutenant Michael Crum violated his constitutional rights. But because sufficient probable cause existed to detain Jerome, we affirm the district court's grant of summary judgment against Jerome's lawsuit for, among other things, false arrest and malicious prosecution.

I

On May 7, 2013, Judith Stiltner brought her thirteen-year-old granddaughter A.K. to the police **[\*\*2]** station of Berkely, Michigan. A.K. alleged that her stepfather, Samuel Jerome, had sexually abused her on two occasions over the past six months. According to the notes of the interview prepared by Detective Sergeant Michael Crum (the encounter was not recorded), A.K. stated[1] that around Christmas-time of 2012, while her mother (Stacey Krahe) was in the hospital, Jerome sat next to her on the couch and began rubbing her stomach. A.K. alleged that she asked him to stop, but Jerome continued and lowered his hand until it reached her vaginal area, which he continued rubbing from the outside of A.K.'s clothing. A.K. requested that he stop once more and attempted to leave, but Jerome allegedly held her down with his free hand for several minutes. The second incident alleged by A.K. took place in late April, again while her mother was away. A.K. described being on the couch in the family room when Jerome sat next to her and began rubbing her stomach. When A.K. tried to get up in alarm, Jerome held her down and rubbed her vagina. On this occasion, A.K. stated that Jerome had gone under her clothes to touch her vagina and also rubbed her breasts from both outside and inside of her clothing. **[\*\*3]** According to A.K., Jerome said nothing during either assault although A.K. begged him to stop. Allegedly, Jerome purchased jewelry for A.K. in an effort to buy her silence. Following the interview, Crum notified Child Protective Services and scheduled a forensic interview with CARE

---

[1] Although "[i]t is well established that a court may not consider hearsay when deciding a summary judgment motion," *Tranter v. Orick, 460 F. App'x 513, 514 (6th Cir. 2012)*, the subject of the current suit is whether the information available to Crum sufficed to constitute probable cause. As a result, the statements "were offered to demonstrate that [Crum]'s investigation of [Jerome] had been undertaken upon probable cause and without malice," rather than to establish their truth, and are not hearsay. *Shipp v. United States, 212 F. App'x 393, 402 (6th Cir. 2006)*; *Fed. R. Evid. 801(c)*.

House (a social services organization that is trained in forensic interviewing of children) on May 16. Jerome arrived later that day at the police station unbidden and admitted only that he had rubbed A.K.'s stomach, claiming that it had been because her stomach hurt. He offered to take a polygraph examination, which was scheduled for May 21.

At the CARE House, however, A.K.'s description of events differed. A.K. was interviewed by Tricia Schuster. Although "[e]verything remained consistent about the dates and where she was positioned," **[*937]** A.K.'s "story changed" according to notes prepared by Crum, who was also in attendance at the interview. Now, A.K. explained that while Jerome had rubbed her stomach and rubbed lower, he did not touch her vagina, either above or below her clothing, and described Jerome's rubbing of her breast as accidental. Finally, when Jerome's hand had gone "below her hip bones near her pubic line," **[**4]** A.K. stated that she had asked him to stop and Jerome had done so. Crum observed that he considered it "a complete reversal of

her recollection of the assaults . . . just a few days prior." Krahe, A.K.'s mother, asked Crum whether he still believed A.K.'s story and was upset when Crum responded affirmatively. Krahe emphasized that A.K. had changed her story and that they were "being played" by A.K. A few days later, Jerome cancelled the polygraph on the advice of his attorney.

About three weeks later, Crum requested to speak with A.K. to discuss the change in her story, but Krahe refused and told Crum that A.K. had confessed that the entire story had been false. She requested that Crum close the case, but Crum indicated that he preferred to speak to A.K. himself before closing the investigation.

Crum made no progress on the case until July 11, when Stiltner returned to the police office to inquire about the status of the investigation. According to Crum's notes, Stiltner informed him that Krahe was claiming Jerome had passed the polygraph test and that the police did not find A.K. credible and had closed the case. Crum disputed those points and again reiterated

his desire to speak with **[\*\*5]** A.K. before closing the case. Stiltner left and returned a few hours later with A.K. Stiltner informed Crum that her daughter was hospitalized out of state for an alleged dissociative-identity disorder, that Stiltner was the legal guardian of both Krahe and A.K., and that she was permitting Crum to discuss the case with her granddaughter, A.K. A.K. told Crum that her mother had pressured her into changing her story at the CARE House, threatening to commit suicide if A.K. testified against Jerome and warning that A.K. and her ten-year-old sister S.K. would be placed in foster care and raped.[2] A.K. repudiated her CARE House statements and reaffirmed her original statements about Jerome touching her on two occasions and having purchased gifts to keep her quiet. She also stated that Jerome had rubbed her ten-year-old sister's stomach in a similar way and bought her gifts, and expressed fear and

---

[2] This interview was not recorded. According to Crum, it was the practice of the City of Berkely not to record sexual-assault victims' interviews. He also stated it was the department's policy not to record juvenile victims. He noted that there was an exception when officers performed a one-on-one interview with a juvenile of the opposite sex in a particular room at the police station.

concern that Jerome was sexually abusing her sister as well.

On July 14, Stiltner reported that A.K. was missing. Krahe was due to return shortly from her hospitalization. According to Crum's police report, Krahe called A.K. that day on the way home and told her that "there would be severe consequences **[\*\*6]** for ruining the family." To flee from her mother, A.K. left her grandmother's house and did not return. A juvenile-runaway report was created. The next day, Krahe contacted the Berkely police and informed them that she had located A.K. In an attempt to confirm that A.K. had in fact been found, officers requested to see her in person. In what was eventually revealed to be a wild-goose chase, Krahe told officers that she was taking A.K. to Beaumont Hospital because her daughter had been **[\*938]** drinking. When an officer arrived at the hospital, the staff explained that A.K. had not been at the facility. The officer next went to Krahe's residence, but no one was home. When contacted by police, Krahe explained that she had decided instead to bring A.K. to

Providence Hospital for insurance reasons. But when the officer arrived at Providence, again the staff explained that A.K. had never been at the facility. Crum received a call from Jerome advising him that Krahe had left the state with A.K. Two minutes later, Krahe called Crum, laughing, to inform him that she was already south of Toledo, Ohio, on her way to Georgia. She was furious that A.K. had spoken to Crum, did not believe her daughter, **[**7]** and told Crum that she had lied about the hospitals in order to be beyond Crum's jurisdiction before he could catch on. In Georgia, she explained, the family could "get a fresh start."

Sometime in the following weeks, Krahe returned to Michigan with A.K. (unbeknownst to Crum). Just after midnight on August 2, the police received a phone call and were dispatched to the Krahe residence to investigate "family trouble." After a disagreement over a lighter in A.K.'s room, there had been a physical altercation in the family. Krahe told the police she suspected her daughter of hiding marijuana and ransacked the room

with Jerome. Neither the police nor Krahe found any trace of marijuana. A.K. was found with scratches on her chest, an abrasion on her leg, and bruising around her right eye. The parties' stories differed in their accounts of a fight: according to A.K., her mother slammed her head against the bed rail and began suffocating her, and then Jerome threw her against the wall many times. Finally, A.K. described being dragged by her hair upstairs and punched in the eye by Krahe. According to Krahe (through Crum's notes), A.K. scratched her and ran into her finger, causing the injury to **[**8]** her eye. Crum did not find Krahe credible. Krahe also played recordings on her phone of conversations between her and A.K. regarding the sexual assault. Crum was suspicious of the recordings based on past experience with Krahe, and A.K. alleged that the recordings had been staged and made under duress. Krahe and Jerome were arrested for child abuse. Crum also recommended that Krahe be prosecuted for witness intimidation. The Oakland County prosecutor brought charges of domestic violence against

695 Fed. Appx. 935, *938; 2017 U.S. App. LEXIS 15774, **8

Krahe and Jerome. Crum shortly thereafter submitted the information he had on the case to the prosecutor's office for consideration of criminal-sexual-conduct charges against Krahe and Jerome.

On August 21, Crum received a message from the Oakland County Prosecutor's Office requesting further information about A.K.'s allegations of sexual assault, which was described as "critical to a determination being made on this warrant request." A.K., S.K., and Stiltner came to the police station to discuss the August 2 incident, and Crum used the opportunity to follow up on the sexual-assault claims. In his notes, Crum described A.K.'s recounting of the story as "exactly" the same as her description on **[\*\*9]** May 7. She described Jerome rubbing her vagina from the outside of her clothing on the first incident, and Jerome pinning her down and coming into contact with her vagina below her clothing on the second incident. This interview was recorded, but Crum insists that he was unaware of that fact. Instead, he claims that his partner turned the camera on during an initial interview of

S.K. and left it running through Crum's later interviews of Stiltner, A.K., and S.K. During his interview with A.K., Crum asked her to recount the story once more, informing her that no one was questioning her story, but they needed to prepare answers in response to **[\*939]** the "legal crap that the defense attorney is trying to pull." He also reinforced her story of why she had recanted earlier: "I know . . . your mom made you change the story." In her description of events at this interview, A.K. stated that Jerome on the first incident had touched her both over and under her clothes. She also stated that Jerome kept asking her "Why?" when she pleaded for him to stop. In her description of where Jerome sat, A.K. stated that he sat on top of her. And finally, A.K. said that Jerome had inserted his finger inside of **[\*\*10]** her. These descriptions were inconsistent in one manner or another with Crum's recorded notes of May 7.

The interview with S.K. provided some additional relevant information for the case. While with her mother, S.K. had claimed that she slept through the August 2

incident. Now that she was not living with her mother, S.K. provided a detailed description of the event, including corroborating A.K.'s story of being dragged by her hair by Krahe. She described changing her story because her mother threatened her.[3] She confirmed that Jerome had been rubbing her stomach as well, but felt that it was not inappropriate and stated that she could not recall any time where Jerome had touched her inappropriately. Crum reported his additional information from the interviews and the prosecutor sought an arrest warrant, receiving it on September 18. Pursuant to this warrant, Jerome was arrested and arraigned, with bail set at $500,000.

On October 9, the Michigan district court held a preliminary examination. At this hearing, A.K.—now fourteen—testified that Jerome had sat next to her on the couch and rubbed her stomach under her clothes.

_____

[3] Some time after this interview, S.K. was returned to Krahe's custody, at which point she again began asserting that she had slept through the incident. Once S.K. was removed from Krahe's custody by court order on September 3, she again provided a description of the events of the night and indicated that she had been told what to say to the police by her mother.

She stated that she told him to stop and he asked, "Why?," and **[**11]** that he refused to stop and touched her vaginal area both on top of and under her yoga pants. She also testified that around May 2013, while the two were in the living room, Jerome also rubbed her stomach under her shirt and moved down to her vagina. She described his finger as coming into direct contact inside of her vagina. In addition, she said that Jerome touched her breasts as well. She also stated that she had changed her story at the CARE House because her mother had told her if she did not, she would kill herself. The judge determined, "based on [A.K.'s] testimony," that probable cause existed and bound the case for trial.

Jerome's trial began on August 4, 2014. After testimony by a number of witnesses, including A.K., Crum testified on August 5 and 7. During his testimony, he stated that he had not recorded any of his interviews of A.K. and that it was department policy not to record juvenile victims. As Crum returned home from testifying on August 7, he learned that there had in fact been a

recording made of the interviews on August 21, 2013. He returned to the police station and the next morning provided the prosecutor and defense counsel with copies of the recordings, which **[**12]** he had received at around 9 a.m. from a certain Sergeant Hadfield at the police station. After a recess, during which the prosecutor and defense counsel viewed the recordings, the judge asked whether a mistrial was warranted. The prosecutor observed that he did not believe a mistrial was necessary, but in fairness to the defendant, a number of witnesses ought to be recalled for further **[*940]** testimony in light of the video. The defense argued that there was police misconduct, important discovery was not provided, and the interviews were conducted in an inappropriate manner. The court found that there was no misconduct, but because the witnesses would have to be recalled and "this case basically redone," as well as a potential substantive issue with Crum's method of interviewing, it held that there was a manifest necessity for a mistrial

without prejudice.[4] Jerome's bail was reduced to $10,000, and a new pretrial date was set for October 8, 2014.

On October 6, the Oakland County prosecutor filed a motion for an order of *nolle prosequi*, on the basis that the State could no longer sustain its burden of proof beyond a reasonable doubt after further investigation. The motion was granted the same **[**13]** day.

On June 24, 2015, Jerome brought suit against Crum (in his individual and official capacities) and the City of Berkely in the United States District Court for the Eastern District of Michigan. His complaint included a number of federal claims—false arrest and false imprisonment, malicious prosecution, denial of due process, and failure to adequately train officers—and state claims—unlawful arrest, malicious prosecution, false imprisonment, and gross negligence. In July 2015, the district court dismissed the state-law claims without prejudice. After Crum moved for summary

---

[4] It is unclear from the record whether the trial court watched the video before declaring a mistrial, but given that the court asked the parties for a description of facts and events contained therein, it seems unlikely.

judgment, the district court held oral argument. Finally, the district court granted Crum's motion, holding that (1) there was probable cause to prosecute Jerome and Crum was entitled to qualified immunity as he had not recklessly disregarded the truth; (2) Jerome could not satisfy the elements of a claim under *Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963)*, because the criminal proceedings had been resolved in his favor; and (3) because there was no underlying constitutional violation, there could be no municipal liability of the City of Berkely. Jerome timely appealed the district court's judgment.

II

*HN1*[↑] We review a grant of summary judgment de novo. *Voyticky v. Village of Timberlake, 412 F.3d 669, 675 (6th Cir. 2005)*. In our **[\*\*14]** review, we view factual evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Radvansky v. City of Olmsted Falls, 395 F.3d 291, 301 (6th Cir. 2005)*. *HN2*[↑]

Summary judgment is proper where the movant can show "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a)*.

A. False Arrest and False Imprisonment

Jerome first asserts a claim under *42 U.S.C. § 1983* for false arrest and false imprisonment. *HN3*[↑] "A false arrest claim under federal law requires a plaintiff to prove that the arresting officer lacked probable cause to arrest the plaintiff." *Sykes v. Anderson, 625 F.3d 294, 305 (6th Cir. 2010)* (quoting *Voyticky, 412 F.3d at 677*). Where, as here, a facially valid warrant was issued, a plaintiff must "prove by a preponderance of the evidence that in order to procure the warrant, [the defendant] 'knowingly and deliberately, or with a reckless disregard for the truth, made **[\*941]** false statements or omissions that create[d] a falsehood' and 'such statements or omissions [we]re material, or necessary, to the finding of probable cause.'" *Id.* (latter two alterations in original) (quoting *Wilson v. Russo, 212*

F.3d 781, 786-87 (3d Cir. 2000)). We have defined probable cause as knowledge "sufficient to warrant a prudent person['s]" belief that a particular individual had committed an offense. Id. at 306. To determine whether probable cause existed, **[\*\*15]** we normally examine the totality of the circumstances, including all inculpatory and exculpatory evidence. Gardenhire v. Schubert, 205 F.3d 303, 318 (6th Cir. 2000). And so in our determination of whether there was probable cause for Crum to seek Jerome's arrest and detainment, we review with the benefit of all of the evidence at the time of the alleged violation.

To aid in this evaluation, a summary of the evidence at the time of the arrest is in order. First, A.K.'s initial description of events, which included the commission by Jerome of the elements of criminal sexual conduct in the first degree and second degree, Mich. Comp. Laws §§ 750.520b, .520c, was bolstered by Jerome's own statements corroborating part of the story—he admitted to rubbing her stomach, although he denied any wrongdoing. HN4[

] In the usual case, "a victim's accusation that she had been sexually assaulted . . . , standing alone, [can be] sufficient to establish probable cause." Klein v. Long, 275 F.3d 544, 552 (6th Cir. 2001). But "the presumption of veracity applies only where the witness is 'someone with respect to whom there is no apparent reason to question the person's reliability.'" Wesley v. Campbell, 779 F.3d 421, 430 (6th Cir. 2015) (quoting Logsdon v. Hains, 492 F.3d 334, 343 (6th Cir. 2007)). Here, A.K. provided a different account at the CARE House, which (if true) was exculpatory for Jerome. Inconsistent descriptions of events are a factor **[\*\*16]** weighing in favor of unreliability. See id. at 432. But A.K.'s later explanation of why her story changed—i.e., duress—is made more plausible by the fact that her sister S.K. also told police repeatedly that her mother had made S.K. change her own story, that her mother had repeatedly voiced an interest to Crum of his closing the case, and that A.K. suffered physical injuries from Krahe and Jerome in a later incident that she alleged was based in part on her providing her account of

events to the police. *See United States v. Provost, 969 F.2d 617, 621 (8th Cir. 1992)* ("Recantation is particularly common when family members are involved and the child has feelings of guilt or the family members seek to influence the child to change her story."). Together, this evidence would seem sufficient to constitute probable cause.

But there was further evidence that weighed against the culpability of Jerome. Even accounting for the recantation at CARE House, A.K.'s description of events in August did not match her initial description in May. Therefore, the question is whether the inconsistencies between the May 7 and August 21 descriptions are of a sufficient magnitude as to damage the credibility of A.K.'s version of events below the level required for probable **[**17]** cause. Considering all of the evidence, we do not believe so. "[I]nasmuch as [A.K.] persisted in her accusations that [Jerome] twice assaulted her to the extent of testifying under oath in trial [and at the preliminary examination], the alleged inconsistencies cannot reasonably be

deemed to compel the conclusion that probable cause had ceased to exist." *Johnson v. Moseley, 790 F.3d 649, 655 (6th Cir. 2015)*. Because Jerome cannot demonstrate that there was **[*942]** no probable cause when his arrest warrant was issued, he cannot meet the required elements of a false-arrest and false-imprisonment claim. The district court's judgment on these claims is therefore affirmed.

B. Malicious Prosecution

*HN5*[⬆] In *Sykes v. Anderson*, this court set out the elements of a malicious-prosecution claim under the *Fourth Amendment*. Those elements are (1) "that a criminal prosecution was initiated against the plaintiff and that the defendant 'ma[d]e, influence[d], or participate[d]' in the decision to prosecute'"; (2) "that there was a lack of probable cause for the criminal prosecution"; (3) "that, 'as a consequence of a legal proceeding,' the plaintiff suffered a 'deprivation of liberty' . . . apart from the initial seizure"; and (4) "the criminal proceeding must have been resolved in the

plaintiff's favor." *625 F.3d 294, 308-09 (6th Cir. 2010)* (alterations in original) **[**18]** (first quoting *Fox v. DeSoto, 489 F.3d 227, 237 (6th Cir. 2007)*, then quoting *Johnson v. Knorr, 477 F.3d 75, 81 (3d Cir. 2007))*. The crux of the case is whether there was a lack of probable cause for the prosecution. Where there is an indictment (or an independent probable-cause determination by a judge), that usually conclusively determines the existence of probable cause. *See, e.g., Sanders v. Jones, 845 F.3d 721, 728 (6th Cir. 2017)*, *as amended on denial of reh'g* (Mar. 20, 2017). But in *King v. Harwood, 852 F.3d 568 (6th Cir. 2017)*, we held that malicious pre-indictment nontestimonial acts by police that were material to the prosecution of a plaintiff could rebut the presumptive probable cause established by a grand-jury indictment. *Id. at 588-89*.

The malicious-prosecution claims with respect to the initial arrest of Jerome stand or fall with the probable-cause determination of his false-arrest and false-imprisonment claims. For the reasons we explained above in holding that probable cause existed for Jerome's arrest, he cannot show the lack of probable cause required for a malicious-prosecution claim. And his claim for his continued detention and prosecution fails for other reasons in addition to the existence of probable cause. Jerome cannot show that Crum's omission of the details of the August 21 interview was material to or strengthened the case against him because A.K. stated **[**19]** the same version of events in the preliminary examination that she did in the August 21 interview. As the district court explained, those discrepancies were made evident before the Michigan judge on October 9 by A.K.'s testimony and were made before probable cause was found on the charges. Crum did not testify at the preliminary examination, nor were his notes or reports used in the probable-cause determination at that hearing. Thus, there was an untainted finding of probable cause that was the source of Jerome's detention; Crum's report had nothing to do with it.

Moreover, even if Crum had maliciously misled the prosecutor into thinking that the

August 21 interview had been identical to the initial May interview, A.K.'s testimony at the preliminary examination in October repeating all of the material differences in the August 21 interview removed any materiality of Crum's statements in the maintenance of Jerome's prosecution. The prosecution (and Jerome, for that matter) would have been aware that A.K.'s October testimony differed from her May testimony. Because those differences were the same differences from the August 21 interview, any diminution of probable cause based on those **[\*\*20]** discrepancies would have already been revealed and Crum's contention of consistent testimony would **[\*943]** have had little impact upon the decision to continue prosecution. Therefore, the withholding of the information within the August 21 interview was not material to the prosecution. And as a result the district court's grant of summary judgment on this count is affirmed.[5]

---

[5] These reasons being sufficient to affirm the judgment below, we need not explore further reasons that might have also sufficed, such as a failure to demonstrate malice rather than inadvertence to rebut any presumption of probable cause generated by the finding of probable cause at the preliminary

## C. *Brady* Claim

**HN6**[↑] The test for claims of denial of due process through the withholding of evidence is derived from *Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963)*. As explained by the Supreme Court in *Kyles v. Whitley, 514 U.S. 419, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995)*, a due-process violation results where the State suppresses evidence favorable to a defendant, material to either his guilt or punishment, and of a nature that would have had a reasonable probability of changing the result of the proceeding. *See id. at 432-33*. This court in *Moldowan v. City of Warren, 578 F.3d 351 (2009)*, extended that obligation from prosecutors to police officers. *Id. at 381, 397*. But we have held that where "the underlying criminal proceeding terminated in [a defendant]'s favor, he has not been injured by the act of wrongful suppression of exculpatory evidence." *McCune v. City of Grand Rapids, 842 F.2d 903, 907 (6th Cir. 1988)*. Because here Jerome's criminal

---

examination, *see King, 852 F.3d at 583*, or collateral estoppel, *see, e.g., Molnar v. Care House, 359 F. App'x 623, 627 (6th Cir. 2009)*.

proceeding ended in the prosecutor's request for, and the trial court's subsequent grant of, a *nolle prosequi* order, he **[**21]** cannot establish the required elements of a *Brady* claim. Accordingly, the district court's grant of summary judgment on this claim is affirmed.

## D. Municipal Liability

*HN7*[↑] Municipal liability is predicated on the existence of a constitutional violation. *Voyticky, 412 F.3d at 679*. Because Jerome cannot establish that there was a constitutional violation, the district court's grant of summary judgment on his municipal-liability claim is also affirmed.

## III

Jerome's claims depend upon a lack of probable cause to arrest, detain, and prosecute him and on the materiality of Crum's misrepresentation of A.K.'s August 21 interview. But any way that you examine it, those claims fail. Objectively, reviewing all of the evidence ourselves, we can see that probable cause for arrest and detention existed. And what is more, it is clear that all of the arguments against

probable cause were in view once A.K. gave her inconsistent testimony at the preliminary examination and yet probable cause was found independent of Crum. Jerome's arguments ultimately are unavailing because nothing Crum did manufactured or removed probable cause. Consequently, the district court's grant of summary judgment to Crum and the City of Berkely is **AFFIRMED [**22]** .

---

**End of Document**